Statement of the Case.
MONROE, J.
Plaintiff in the petition filed by him alleges that he entered into an agreement with defendant (A. B. Powell) where-under the latter, upon the security of real estate consisting of a tract of land with improvements, in the parish of Calcasieu, was to advance him a sum of money and pay certain debts for which he (plaintiff) and said property were obligated, and that, pursuant thereto, on October 4, 1905, plaintiff executed a notarial act, by which he intended to, and did, secure defendant, and in which it was stipulated that the buildings and improvements upon the land therein described and affected “are attached to, and form part of, said realty, by destination, and being a fixture thereon, shall not be removed therefrom during the tenure of this mortgage”; that, whilst it is stated in said act that the consideration for its execution is the sum of $4,610, of which plaintiff received $1,510, and for the balance, “say $3,100,” defendant assumed and promised to pay certain debts (secured by mortgage on said property aud due by plaintiff to the Perkins-Miller Lumber Company and the Lake Charles Carriage & Implement Company), the facts are that plaintiff received only $1,250 in cash (which was for a lease of part of the land), and that defendant has not paid more than $1,950 in extinguishment of said debts. Plaintiff further alleges that it was also agreed that, on his payment of said debts, defendant should execute an instrument in writing relinquishing all rights accorded by the act of October 4, 1905, and acknowledging that plaintiff had the right, on refunding the money advanced for such payment, with interest at 8 per cent, from the date of said act, to take back said land free from all liens and incumbrances; but that, notwithstanding his repeated promises to that effect, defendant has failed to comply with said agreement, and is now seeking to dispose of said land “and, thereby, to defraud, if possible, your petitioner of his rights in, and to, the above described tract of land, or to throw him into a position that will result in harassing and vexatious litigation”; and that he is entitled to have defendant execute an instrument giving him (plaintiff) the right to take back the property in ques *409 tion on payment of $1,950, with interest at 8 per cent, from October 4, 1905, provided such payment is made within three years from that date, or that he is entitled to have the act of October 4, 1905, amended and reformed so as to read:
“It is agreed * * * that, upon payment to Arcy B. Powell, his heirs or assigns, of the sum of $1,950, with 8 per cent, per annum interest from October 4, 1905, until paid, by Gideon Rester, his heirs or assigns, the said Gideon Rester shall have the right to take back, free from all liens and incumbrances, the tract of land described in the instrument * * * dated October 4, 1905, * * * and the said Arcy B. Powell shall cancel and erase the above described instrument, provided said payment is made on or before three years from October 4, 1905.”
Or that:
“Petitioner is entitled to have all the above rights granted him by judgment of .this court, decreeing that he shall have the right to retake, free * * *, the land * * * upon payment * * * of the sum of $1,950 with * * * interest * * * on, or before October 4, 1908.”
And he prays for judgment accordingly.
To the petition so filed there was annexed an interrogatory on facts and articles (which defendant was ordered to answer), reading as follows, to wit:
“Is it not true that you agreed and promised to execute an instrument of writing setting forth that upon payment by me to you of the amount disbursed by you in satisfaction of a mortgage due Perkins-Miller Lumber Company recorded in Book 4, p. 254, and the same book, p. 443, book 5, p. 24, and the judgment in favor of the Lake Charles Carriage & Implement Company, in Book 11 of Mortgages on page 204 of the records of Calcasieu parish, together with the interest at 8 per cent, per annum from October 4, 1905, * * * I should retake all of the property, free from liens and incum-brances, described in the instrument of writing dated October 4, 1905, passed before Augustus M. Mayo, notary public in and for Cal-casieu parish, and recorded in Book 69 at page 388 et seq. of Conveyance Records of Calcasieu parish, provided the payment of $1,950, with interest at the rate of 8 per cent, per annum from October 4, 1905, until paid, was made to you on or before three years from October 4, 1905?”
By supplemental petition plaintiff alleges that, since the institution of the suit, he has discovered, that defendant (A. B. Powell) by act of date January 22, 1906, recorded January 27, 1906, made a pretended transfer of the property in question to M. D. Powell, and that, acting under an instrument signed by M. D. Powell, G. Purnell Whittington attempted to transfer said property to M. E. Tickers; that the pretended transfer by defendant is a simulation, or, if not a simulation, is an act by which the parties conspired to pass the title of said property to a third person, in the hope of thereby defeating plaintiff’s claim; that M. D. Powell well knew, and the records warned him, that it was never intended that said title should pass from plaintiff to Arcy B. Powell; that M. E. Vickers well knew the facts alleged by plaintiff, and has not, in truth, purchased said property; the purpose of the act passed between him and M. D. Powell being merely to aid in defeating plaintiff’s claim. And he prays that M. D. Powell and M. E. Vickers be made parties defendant, and ordered to answer certain interrogatories on facts and articles which are annexed to the supplemental petition. And it was so ordered.
Plaintiff, thereafter, filed another supplemental petition propounding to the defendant Arcy B. Powell the following additional interrogatories, to wit:
“(1) If you answer in the negative interrogatory first addressed to you with the original petition in this suit, then say whether you agreed to execute a document giving Gideon Rester the right to take back the land described in the instrument of writing dated October 4, 1905, within three years from October 4, 1905, and give conditions under which same was to be done?
“(2) If you answer the above interrogatory in the negative, state if it is not true that you did agree to execute some form of document giving Gideon Rester the right to take back said land, and give the conditions that were to be stipulated in said document.”
To the interrogatory annexed to the original petition A. B. Powell answered:
“No; I made no such agreement with, or I promise to, plaintiff in this case. The sale *411 from Gideon Rester to me, dated October 4, 1905, recorded in Book 69 of Conveyance Records of Calcasieu parish was an absolute and unconditional sale to me of the property therein described.”
The interrogatories annexed to the supplemental petition, not having been answered within the delay fixed, were ordered to be taken for confessed, but, on showing made, the order was set aside, and the interrogatories were answered in the negative.
The answer of defendants M. D. Powell and M. E. Vickers to the interrogatories propounded to them purport to show that their transactions were real and made in good faith. We, however, note the following, to wit:
“Int. 12 [propounded to M. D. Powell]. Did G. Purnell Whittington write to you after this last transaction, evidenced by act passed before John Rohrer, notary public, telling you on what terms and conditions he had sold the property to M. E. Vickers'! If he did, attach the letter.”
To which he replied:
“He written me and the terms was agreed on before he went down there, and he written me and inclosed the notes. The terms of sale was agreed on between me and him before he went down there, in person.”
The letter of Whittington thus referred to was not attached to the answers.
“Int. 7 [propounded to M. E. Vickers]. Is it not a matter of fact that you knew Gideon Rester had not sold the land to Arcy B. Powell that was described in Gideon Rester’s original petition, and which said land is also described in the certified copy, dated October 4, 1905, passed before Augustus M. Mayo, notary public? A. No, sir.
“Int. 8. Didn’t Gideon Rester inform you that he had not sold that land to Arcy B. Powell, and didn’t you tell him to go to Powell, and have the matter fixed up? A. Gideon Rest-er — I went to Gideon Rester and he told me he had sold to Arcy B. Powell, and afterwards, after I had made the trade, that Powell — why, he told me, then, that there was some agreement between him and Powell. I done bought the land from Powell before he told me he still held claim on it.”
For answer to the supplemental petition by which he is made party defendant, M. D. Powell alleges that he bought the property in question from A. B. Powell by act before Whittington, notary, January 23, 1906, and that he sold it to Vickers, and he denies that there was any fraud or collusion in either transaction, and prays that A. B. Powell be called in warranty, and, in the event of an adverse judgment, be condemned to refund the price paid. And Vickers, for answer to said supplemental petition, alleges that he bought said property from M. D. Powell by act before Rohrer, notary, of date February 16, 1906, and prays that both M. D. Powell and A. B. Powell be called in warranty.
Upon the trial in the district court it was shown that plaintiff is an uneducated man, whose skill as a chirographist is about limited to the writing of his signature, and who can read writing, “if it isplain”; that the land there in question (consisting of some 1,640 acres of “cut over” pine), with that upon which plaintiff’s residence is established, forms a continuous tract upon which plaintiff’s live stock have ranged, and are ■ still ranging, there having been something like .10 acres fenced in about his residence, and about 5 or 6 acres fenced upon that portion of the tract Which is here in dispute and upon which there was, and is, also a residence, occupied by plaintiff’s brother, and a barn, 50 by 80 feet in width and length; that early in September, 1905, plaintiff received from defendant (A. B. Powell), with whom he was then, unacquáinted, a letter reading as follows, to wit:
“A. B. Powell,
“Manufacturer of ’Spirits of Turpentine & Rosin,
“Telegraph Office, Boyce, La.
“Lena Station, La. 8/29/05.
“Mr. G. Rester, Kinder, La.
“Dear Sir: I was at your place a few days since; and left a message with your son, which, no doubt, you have ere this. I notice that you have a nice lot of turpentine timber, and I would like to make a trade with you and give you an interest in the business. If you are willing to entertain the proposition at all, I will go down and see you just as soon as I *413 hear from you. Now, if you need any money outside, and owe anything on your timber, I will loan you the money to pay it, and then pay you the cash for the turpentine lease, and let you have an interest also. I can make more money for you by turpentining your timber than you can ever make by logging it, and, besides, you have all your timber left, and, after it is turpentined, it sells for just as much, and is not hurt a bit and will even float better in the rivers as it is not so sappy. Consider the matter and write by return mail, and X will go down at once; and, of course, in case we cannot trade, no harm is done.
“Tours truly, A. B. Powell.”
Whether plaintiff answered the letter so received does not appear; but later in the month (September) in which it was written A. B. Powell called upon him at his residence, and an understanding was then reached, as a result of which Powell again, on October 4th, called at plaintiff’s residence in a buggy in which he and plaintiff rode to Oberlin, where they took a train to Lake Charles. When they arrived at Lake Charles and were on their way to the office of Mr. Overton, a member of the bar, Powell told plaintiff that he (Overton) would act for both of them, and plaintiff proceeded with the transaction without being otherwise informed. As a matter of fact, Mr. Overton did not know that any such statement had been made, and acted entirely as the attorney of Powell; his testimony upon the subject being as follows, to wit:
“Q. Lid it come to your knowledge that Mr. Powell had told Mr. Rester that you would act for both of them? (Objections by counsel and ruling by the court.) A. The only time that any mention was made of it of which I have any recollection was on the 4th of October, 1905, about 4, or between 4 or 5 o’clock in the afternoon, in front of Mr. A. M. Mayo’s office in this city. At the time the deed was being drawn Mr. Powell, in speaking to Mr. Rester, stated substantially that I could act or was acting for both, a statement which I afterwards gave Mr. Powell to understand was unauthorized on his part, and he should not have made it, as I was not representing Mr. Rester. Q. That correction was not made in Mr. Rester’s presence? A. I think not- no, sir. * * * Q. (by Plaintiff’s Counsel) Mr. Overton, do you remember the conversation between yourself, Mr. Gideon Rester,' and Arcy B. Powell concerning the transaction of the. land described •in the document passed before A. M. Mayo, notary public? A. Before answering your question, I wish to say that I was attorney for Mr. Powell and also considered myself attorney for A. B. Powell, and I don’t feel that I have a right to testify in this case without his consent. (The court having called upon Mr. A. B. Powell to know whether or not he would consent, and he having refused, the court sustained the witness Mr. Overton in his position, and will not require him to disclose what transphred. To which ruling of the court counsel for Gideon Rester except and reserve a bill.)”
The witness having been recalled, the following occurred:
“Q. (by Plaintiff’s Counsel). Mr. Overton, will you state to the court what was the true transaction between Arcy B. Powell and Gideon Rester relative to these lands that are in controversy in this suit? (Objection by counsel and ruling by the court) A. About the 2d day of October, 1905, Mr. Powell came to see me, Mr. A. B. Powell, defendant in this case, came to see me relative to some land owned by Gideon Rester. Mr. Powell stated that he wished to acquire a turpentine lease on the land, and stated that he understood— By Mr. Williams (Counsel for A. B. Powell). Q. Were you acting as Mr. Powell’s attorney? A. Yes, sir; I understood that there was no objection raised. I was acting as Mr. Powell’s attorney, and I don’t care to answer unless Mr. Powell is willing. Q. That is what we want to know, whether the transactions between you and Mr. Powell were confidential? ' A. It is a fact and I understood that no objection was raised at the time — that consent had been given. However, I was acting as attorney for Mr. Powell, and, as these communications- were confidential, I don’t feel justified in answering them without the consent of Mr. Powell. (Counsel for plaintiff now asks if they have any objections to Mr. Overton testifying that they make them or that he proceed to testify. Befendant A. B. Powell objects to the introduction of any confidential communications between him and his own counsel.)”
Defendant (A. B. Powell), being on the stand, was asked:
“Will you permit me to ask your attorney, Winston Overton, the question that you answered in the negative, and will you give your consent of (to) your attorney to answer it, as to whether there were any other agreements concerning this land that are not stated in the act passed before Mr. Mayo?”
To which he replied:
“I will not.”
Plaintiff testified, over objection by counsel for defendant, in part as follows:
*415 “Q. What was the real contract between you and Mr. Powell? A. He came to my house to ■see me, to lease my land for turpentine orchard, and I told him I could not lease my land, as there was some mortgage notes against it. Pie said that he would raise those mortgages for a lease of the land for three years. At the end ■of the three years, I was to take up those mortgage notes at 8 per cent, interest. I told him, if he would do that, I would lease it to him. * * * At the end of three years I was to pay him the amount of money back that he had taken up those mortgage notes. * * *
“By the Court: Q. How about the turpentine —was he going to get it all for nothing, or how? A. 1-Ie was to give me $1.25 an acre on it.
“Q. When? A. He was to do it then, as soon as he had taken up those notes. Q. Was he to allow you that in cash? A. Yes, sir; he was to allow me that in cash. Q. How were you to pay him at the end of three years? A. I was going to haul logs — first one thing and another to malee money to pay him.
“By Mr. Sompayrac (Plaintiff’s Counsel). Q. Now, was that agreed to in Mr. Overton’s presence between yourself and Mr. Powell? A. Yes, sir. Q. You are willing to have Mr. Over-ton decide that, are you? A. Certainly; yes, sir.”
The act executed before Mayo, notary, on October 4, 1905, so far as it needs be here quoted, reads as follows, to wit:
“ * * * Personally appeared Gideon Rester, * * * who declared that for the consideration and on the terms and conditions hereinafter expressed, he does, by this act and by these presents, grant, bargain, sell, convey, transfer, assign and set over unto Arcy B. Powell * * *, here present, accepting and purchasing * * * and acknowledging delivery and possession thereof, the following described real property, * *. * to wit: [Here follows the description of the land.] It is further agreed that the building and improvements on said land are attached to, and form part of, said realty, by destination, and, being a fixture thereon, shall not be removed therefrom during the tenure of this mortgage. * * * To have and to hold the said property and appurtenances unto the said purchaser his heirs and assigns forever. And the said purchaser hereby binds himself and his heirs, forever, to warrant and defend the property and appurtenances herein conveyed against all legal claims and demands whatever. The said vendor, moreover, transferring unto the said purchaser all the rights and actions of warranty to which he is, or may be, entitled * * * , subrogating said purchaser to the said rights. * * * This present sale is made and accepted for * * * the total sum of $4,610, in deduction and part payment whereof, the said purchaser has paid * * * the sum of $1,510, the receipt whereof is hereby acknowledged, * * * and for the balance, say $3,100, the said purchaser assumes and promises to pay the following items: The mortgages due Perkins and Miller Lumber Go. * *' * and the judgment in favor of the Lake Charles Carriage and Improv. Cov Ltd. * * * Taxes are assumed and to be paid by the vendee. This done, read, and signed at my office. * * * ”
The notary before whom the act was executed gives the following (with other) testimony, to wit:
“Q. (by. Defendant's Counsel). At whose instance did you prepare this document, Mr. Mayo? A. Both parties were present. Q. Which parties — Mr. Rester and Mr. A. B. Powell? A. Yes, sir. Q. What sort of a document were you directed by them to prepare? (Objection and ruling.) A. It was my understanding that I was to draw up a conveyance deed. Q. Conveying the property? A. Yes, sir. Q. I will ask you to explain, Mr. Mayo, how it happened, or how it occurred, that this clause, ‘It is further agreed that the buildings and improvements on said land are attached to, and form part of said realty, by destination and being fixtures thereon, shall not be removed during the tenure of this mortgage,’ — I will ask you to explain how it occurred that this clause was left in and not stricken out. A. The clause is printed in my form and I failed to erase — just left it there. * * * Q. (by Plaintiff’s Counsel). Mr. Mayo, was Mr. Over-ton present? A. Yes, sir. Q. You read this act, didn’t you, to them? A. I cannot recall whether I did or not. Q. Did you pass an act not letting them know what they were signing? A. No, sir; Mr. Overton read it for Mr. Powell, and I cannot now recall whether it was read otherwise. * * * Q. Then, according to your custom, you believe you read this act, do you? A. Yes, sir.”
Our conclusion from this testimony, considered in connection with the surrounding circumstances, is that the act was prepared under the direction of the defendant, or his attorney, since it is clear that the notary must have received directions from some one, and, though in answer to the questions, “At whose instance did you prepare that document?” and “What sort of document were you directed by them to prepare?” he answers, “Both parties were present,” and, “It was my understanding that I was to draw up a conveyance deed,” it seems altogether unlikely that the plaintiff, a plain farmer, should have given any instructions in the presence of a competent attorney, whom he believed *417 (upon the faith of the defendant’s assurance to that effect) was representing both him and the defendant, and, so far as he knew, was there for no other purpose than to see that the act was properly drawn. And we are not convinced that the inclusion of the clause relating to the improvements and characterizing the act as a mortgage was the result of accident or inadvertence, for it will be observed the notary in answering the question, “I will ask you to explain how it occurred that the clause was left in there and not stricken out?” says merely that he failed to erase the clause from his printed form, but does not say whether the failure was due to inadvertence or other causes. It was shown that some months after the execution of the act in question (possibly about Christmas of 1905) the defendant Vickers visited plaintiff at the latter’s residence, bearing an open communication from Powell, which reads as follows:
“Mr. Gid. Rester. Please show Mr. Vickers over your land. He has an idea of wanting to buy. Will send you check for $250 as per your letter. Will see you when I get back. Am on my way to S. C. to see my family.”
And we find in the record another letter from Powell to defendant, dated January 24, 1906, reading:
“I inclose you check for $250, as per your letter. I am figuring on going back down there within the next 30 days. Regards to your family.”
The record does not inform us as to the contents of the letter to which Powell thus refers, unless the information be contained in the testimony of the plaintiff, to the effect that he received only $1,250 in cash at the execution of the act before Mayo, that it was understood between him and Powell that the matter was thereafter to be placed upon a clearer footing, and that he wrote to Powell several times on the subject, but got no answer. It is hardly to be supposed that plaintiff retained copies of his letters, since such is not the custom with farmers, but Powell might have produced the original of the letter to which he refers, and it is a pity that he did not, since it is probable that it would have thrown some light upon his and plaintiff’s attitude at that time with respect to the pending business. If, for instance, plaintiff wrote to him for $250 as due upon the $1,510 mentioned in the act of October 4th, and spoke of the $1,250 as having been paid on account of the lease of the land for a turpentine orchard, that circumstance, taken in connection with Powell’s answers, would be significant. As it is, the fact that Powell sent $250 which does not appear to have been called for by the act in question is wholly unexplained, save upon thé theory propounded by plaintiff and supported by his testimony. It was shown that prior to the acquisition by Vickers of the title which he sets up in his answer he and plaintiff met upon a railroad train, and that plaintiff then told him that he had not sold his land to Powell, but had leased it for turpentine purposes, and plaintiff testifies that Vickers told him that he (Vickers) would not buy the land, but that he had put up $500 as a forfeit, which he would lose if he did not buy, and that plaintiff had better go and see Powell. We have already noted what Vickers says upon that subject in answer to the interrogatories on facts and articles. His testimony, given on the stand, is as follows:
“Q. Mr. Rester was on that train, wasn’t he? A. It seems like I remember coming down with him. Q. That was before yon passed this act before John W. Rohrer, was it not? A. Yes, sir. Q. Do you mean that Mr. Rester did not tell you, then, that Mr. Powell had not bought the land? A. I bought the land in December. Q. Where is your deed? A. At home. Q. You have no other deed besides this one? A. I had an agreement the same as a deed. Q. Why haven’t you procured it or referred to it here before? A. It has been produced — a draft there where I paid him $500 on it. Q. Haven’t ever recorded it? A. The agreement? Q. Yes, sir. A. No, sir; I have not recorded it. Q. Didn’t Mr. Rester tell you, coming down on that train, that he hadn’t sold this land to Arcy B. Powell or any one else? A. Yes, sir ; he told me something to that effect — that him and Mr. Powell had some agreement between them. * * *
*419 “Mr. MeOoy (on the part of defendant M. E. Vickers): Q. Mr. Vickers, in that conversation did Mr. Rester tell you that he was still the owner of that land? A. No, sir. Q. What did he tell you? A. He said that there was some agreement between him and Mr. Powell, some way. Q. Did he warn you not to buy the land? A. He came out to my commissary, and said something about that there was an agreement. I don’t know as he warned me not to buy the land. That was a month or two after I had done made the trade. I bought the land in December. Mr. Powell had to go back to Georgia and didn’t have time to fix up the papers, then. * * *
“Q. (By Plaintiff’s Counsel). [Did] you ever admit that, before you passed this act before John W. Rohrer, Mr. Rester did tell you that he had an agreement or contract concerning that land with Mi'. Powell? A. Yes, sir; he told me he had some kind of an agreement with Mr. Powell. Q. And he tried to get you not to buy that land? A. I had already bought it.' Q. Didn’t he try to get you not to go on further with that purchase? A. 1-Ie may have, I don’t remember what he said to me, sir.”
Referring to an interview that he had had with Rester prior to the date of his alleged purchase, as represented by the draft of $500 to which he refers, and prior to the date of his visit when he carried with him the note from Powell, the witness says:
“Well, before I went up there, I asked him if he had sold his land to Mr. Powell, and he said he had. * * * He told me he had sold it all, except 80 acres, his home place, that he had kept out. * * * Q. Did you afterwards buy any of the land? A. Yes, sir; 1 bought all of it, I bought it from Arcy B. Powell there.”
He further testifies that the interview to which he then refers was the same to which the witness Cole testifies, and his counsel speak of Cole as a citizen of high standing, entirely without interest in the case. Referring, then, to Cole’s testimony, we find that, whilst he was in conversation with Vickers on the public road, Rester drove up; that he introduced them to each other and they began talking about land; that Cole started to leave, and, as he did so, heard Rester say that he had sold out, or dealt out; his exact language being:
“I started off, and the answer was, T sold out’ or T dealt out,’ I don’t know which, but the word ‘out’ was applied in the conversation.”
It no more corroborates Vickers than it does Rester, since the latter denies that he had told the defendant that he had sold the land, and, having leased it for three years to Powell, as he understood it, had practically cut himself off from selling it to any one else, and might very well have said that he had “dealt out.” M. D. Powell and one or two persons, intimately connected with the defendant, also testify that Rester said that he had sold the land, and it may be that they are sincere in their statements (though the defendants themselves are not conspicuous for their candor) as it can readily be understood that a witness hearing the supposed owner of a tract of land answer a proposition to buy it by saying that he had already made a deal, or had already “dealt out,” might conclude that he meant that he had sold out. That Rester did not consider that he had sold out we think is plain enough; and it would probably be more so if A. B. Powell had produced the letters written to him by Rester after the date of the contract of October 4, 1905. But, as far as Vickers is concerned, it might be conceded that he supposed, when he gave the draft for $500, that Powell would be able to make him a title to the land, and yet his position would not be improved for the purposes of this case, since the c(raft, or rather the receipt that was given, evidenced an inchoate contract, and it is abundantly shown that, before the contract was perfected, he was specifically warned that Powell was not the owner of the land.
The draft reads as follows:
“Douglas, Ga., Dec. 18, 1905. No. --■.
“The Union Banking Co.:
“Pay to the order of A. B. & M. D. Powell ($500) five hundred dollars, in currency funds.
“[Signed] M. E. Vickers.”
The receipt which he took reads:
“Received of M. E. Vickers ($500) five hundred dollars in part payment on certain lands known as the Gid. Rester & J. R. Lyles land, aggregating 2,560 acres, more or less.
“12/18, 1905. [Signed] A. B. & M. D. Powell.”
*421 It will be observed that tbe draft is made payable to, and tbe receipt, signed by, not M. D. Powell, in whose name tbe title to the lands stood, but A. B. & M. D. Powell. It will be remembered too, that Vickers, in speaking of his purchase of the land, said:
“I bought it from Arcy B. Powell, there.”
And, in the same connection, we find that on December 6, 1905, Arcy B. Powell had written to Vickers in part as follows, to wit:
“We have just returned from S. C., and have your favor of the 28 ult. Sure, if we sell to you, we don’t want to charge you too much. * * * We, also, note the decline in prices. * * * We own, in fee simple, down there, 2,560 acres. We will take $6.00 per acre for 1,600 acres and $5,000 for the other 960 acres; this is the John Lyles land. * * * In conclusion will say that should you decide to buy, we must hear from you promptly. * * * We have actually gotten up a good squad of hands to take down there and insist on an immediate reply.
“Yours truly, [Signed] A. B. Powell.”
It will be observed, therefore, that A. B. Powell was negotiating for the sale of the Lyles tract, which stood in the name of M. D. Powell, just as he was negotiating for the sale of the Rester tract, of which (according to his present pretensions) he himself was the owner, and the sale thus negotiated was consummated by his uncle (M. D. Powell), when, a short while later, the title to the Rester land had been put in his name. Another thing that the record discloses, in this connection is that on January 23, 1906 — the day upon which A. B. Powell executed the act purporting to transfer the Rester tract to M. D. Powell — the latter executed a power of attorney authorizing the notary before whom that act was passed to sell said tract, with any other land that he might have, in the same, and the adjoining, townships, to M. E. Vickers for $15,750, and about a month later the sale to Vickers was made of the Lyles and Rester tracts for a total of $16,-796.32; so that, if the sale from A. B. Powell to M. D. Powell was genuine, the former, with his eyes wide open, made his uncle a present of the difference between the price at which he says he bought the Rester tract and the price at which it was then sold to Vickers, a matter of some $5,000, or $6,000, or more. For the purposes of this case and notwithstanding that they swear that the Rester tract was sold by A. B. Powell to M. D. Powell for $7,000, and by M. D. Powell to Vickers for some $9,000, $10,000, or, perhaps $11,000, the defendants undertake to show that that tract is worth only about $3 an acre, or say a total of $4,920. Rester, however, testifies that it was worth $8 or $9 an acre, or say (at the lower price) $13,120. The record further shows that Vickers, having paid the $500 to A. B. Powell as a bonus (according to the testimony of M. D. Powell), agreed to pay the balance of the price in two installments, the one of $5,429.66 on July 1, 1906, and the other, of $10,766.66, on January 15, 1907. He was, however, made a defendant in this suit, and appeared in March, 1906; and yet on July 22d following he sent a draft to M. D. Powell as in payment of the note of $5,429.66, and he testified that the note has been paid, but that he has never received it, and, further, as follows:
“Q. I-Iave you ever received any acknowledgment, any letter acknowledging receipt of the draft? A. Yes. sir; I received that. * * * Q-. Where is that letter from Powell, acknowledging receipt of the draft on the Naval Stores. Have you got it with you? A. No, sir. Q. Where is it? A. I couldn’t say where it is. I have got the draft, though, that shows that it has been paid. * * * Q. What reason did he give you for not returning the note? A. I hav’n’t got a scratch from him. Q. You say he had written you a letter? A. No; I said I got the check back — that it had been paid. * * * Q. You say there in answer to one question— stated — you received a letter, and then when asked about it, you stated you could not say where it was — you know you made those statements, don’t you? A. I know I had got the draft back, and it had been paid, but I don’t remember exactly about the letter business. * * * Q. Then you didn’t testify with reference to the letter twice? A. Well, I might have testified, but I was meaning about the draft. I didn’t mean a letter. Q. Now, what efforts have you ever made to get that $5,000 note that you sent a draft for and paid? A. None at all.”
*423 We have already noted that in his answers to the interrogatories on facts and articles he speaks of letters from Whittington, which he failed to annex, though requested so to do. It appears that M. D. Powell died about the last of July, 1906, and his administrator testifies that both of Vickers’ notes are in his possession, but he seems to be rather careful not to say that either of them has been paid.
It is shown that A. B. Powell paid the debts due by Rester to the Perkins & Miller Lumber Company and the Lake Charles Carriage Company, amounting in the aggregate to say $3,078.99. Upon the case, as thus presented, the district court gave judgment for plaintiff, decreeing that the act passed between him and A. B. Powell, of date October 4, 1905, stand as a mortgage, and that it is not a sale; that the act purporting to be a sale from A. B. Powell to M. D. Powell, of date January 23, 1906, and the act purporting to be a sale from M. D. Powell to M. E. Vickers, of date February 16, 1906, are void and of no effect as to the title of the property ; that Thomas S. Hawes, administrator of the estate of M. D. Powell, recover of Arcy B. Powell $7,000, with legal interest from the date of the judgment; that M. E. Vickers have judgment against said Hawes, administrator, decreeing void the note of $10,766.66 held by him, and for the sum of $1,029.06, “being the remaining portion of the purchase price of above-described property after cancellation of the note above described and for 5 per cent, interest upon said sum” from the date of the judgment; and the judgment further disposes of the question of costs. The defendants prosecute the appeal, and plaintiff prays that the judgment appealed from be affirmed.
Opinion.
Plaintiff excepted to the ruling of the district court sustaining an objection to the testimony of Winston Overton with regard to the agreement between him (plaintiff) and A. B. Powell, which objection was based on the ground that the information sought to be elicited was obtained by Overton in his capacity as Powell’s attorney, and was privileged. There is no doubt that an attorney at law cannot be called on as a witness to disclose information imparted to him in confidence by his client; but we understand that in the instant case the agreement which plaintiff sought to prove was entered into .between him and Powell in the presence of the witness, and we do not understand that any privilege extends to things said or done between the client and his attorney, upon the one hand, and to a third person, upon the other, since there can be no confidential communication between attorney and client, when a third person, having an adverse interest, is present and participates in what takes place. If, therefore, the testimony of Mr. Overton, as to what took place between defendant and plaintiff, in his presence, were considered necessary to a decision, the case would be remanded.
Defendants objected to the introduction of any testimony tending to contradict their answers to the interrogatories on facts and articles on the ground that plaintiff is concluded by those answers. The rule is well established that where, in a litigation between parties to an authentic act purporting to convey title to real estate, one of the litigants attempts, by means of interrogatories on facts and articles propounded to his opponent, to prove a contract at variance with that expressed in the act, he must stand upon the answers made to such interrogatories, unless he then chooses to rely upon the act itself. We do not, however, understand that if, in such a case, the litigant elects to stand upon the act, he is precluded by the answers to the interrogatories from proving, by parol testimony or otherwise, anything that he might have proved if no' interrogatories *425 had been propounded, and no answers obtained. The rule upon the subject has been stated as follows, to wit:
“It is true that article 354 of the Code of Practice provides that ‘the answers of- the person interrogated may be contradicted by the oath of two witnesses or one single witness, corroborated by strong circumstantial evidence.’ The article now reads: ‘The answers of the person interrogated are evidence but do not exclude adverse testimony, and shall be weighed by the judge as other evidence.’ But it does not follow (as it has been urged) that a party would, by probing the conscience of hj£¿#*¡íiersary, be enabled to introduce parol proof to contradict his answers in relation to a notarial act, or the oral sale of an immovable. This article of the Code of Practice must be construed with reference to the other provisions of law, and can (not?) be held to authorize the introduction of the testimony of a witness only where such mode of proof is admitted. But, where the answers of the party supply the place of written proof (in those cases where written proof is required by law), no parol evidence can be received to contradict them.” Semere v. Semere, 10 La. Ann. 704; Godwin v. Neustadtl, 42 La. Ann. 735, 7 South. 744; Wright, Blodgett Co. v. Elms, 106 La. 159, 30 South. 311; Rush et al. v. Landers, 107 La. 553, 32 South. 95, 57 L. R. A. 353.
In the case at bar, however, the plaintiff alleges that he made a certain contract, and he exhibits the notarial act of October 4, 1905, as the partial evidence thereof. Ordinarily the meaning of such an act would be ascertained from the face of the instrument, but in this instance, by reason of the language and of the conditions agreed on, the meaning is ambiguous, and cannot be ascertained in that way; hence the door is opened to parol and other evidence, not to vary the terms of the instrument, but to render it intelligible. The case, therefore, is one in which the evidence thus referred’ to, being authorized by law, is not to be excluded by the answers to interrogatories, which quoad such evidence are to be “weighed by the judge as other evidence.” Code Prac. art. 354.
Defendants insist that the act in question can be interpreted without proof aliunde; that the thing, the price, and the consent of the parties being designated and expressed, the contract, of which the act is intended to be the evidence, is one of sale. But the consent contemplated by the law is the consent of the vendor that the thing shall be placed, absolutely and for all purposes, under the dominion of the supposed vendee, together with the consent of the latter to acquire such dominion, whereas, in the act in question, we find that the “thing” which is said to have been ' sold for a. single price (assuming that the price is definitely agreed on) is a tract of land with the buildings and improvements thereon, and that, with reference to the latter (of which the relative value is not even suggested), the parties have stipulated that they “shall not be removed during the tenure of this mortgage.” Conceding, then, that, where a contract contains all the conditions, to the aggregation of which the law gives the name “sale,” it is a contract of sale, though called by some other name, we have here a ease in which, not only do the parties call the contract by another name than sale, but in connection with that circumstance there is the other, that an essential element of the contract of sale, to wit, that the vendor should surrender, and the vendee acquire, the absolute dominion of the thing sold, is lacking.
It is said that the clause relating to the buildings and improvements was inserted, or left, in the act by inadvertence, and defendants undertook to prove that fact, and thereby to vary the terms of the instrument by parol evidence, though denying to plaintiff the right in that way to explain its ambiguity. We are of opinion, however, that whilst defendants were entitled to prove the error, if error there was, plaintiff was entitled to introduce evidence to explain the ambiguity of the existence of which there can be no doubt. As to the probative effect of the evidence referred to, considering, first, that offered on behalf of plaintiff, we find that it proves beyond reasonable doubt that the whole agreement between plaintiff and A. B. Powell was as stated by plaintiff that *427 lie was to lease his land to Powell for turpentine purposes for three years from October 4, 1905, at $1.25 an acre, paid down, and that, as an additional consideration, Powell was to take up the mortgages resting on the property in favor of the Perkins & Miller Company, and pay the judgment in favor of the Lake Charles Carriage & Implement Company and carry those obligations, charging therefor interest at the rate of 8 per cent, per annum, until the expiration of the three years, which agreement under the authorities, and in view of the evidence adduced, showing that Powell never took possession of the property and that the alleged price was wholly inadequate, must be held to have contemplated merely a contract for the security of Powell. Collins v. Pellerin, 5 La. Ann. 99; Baker v. Smith, 44 La. Ann. 925, 11 South. 585; Davis v. Kendall, 50 La. Ann. 1121, 24 South. 264; Marbury v. Colbert, 105 La. 467, 29 South. 871. We further find that the agreement so entered into was to be witnessed by two written instruments, to wit, the act of October 4, 1905, and another, to be executed at a later date — no doubt after the exact amount due to the Perkins & Miller Company and the Lake Charles Carriage & Implement Company should have been ascertained and paid.
Considering the evidence offered in behalf of defendants, to prove the alleged error in the notarial act of October 4, 1905, the act in question was drawn up under the direction of A. B. Powell, aided by his legal adviser, and was read over by the latter to the former, and the presumption is that its terms were made as favorable to Powell as the circumstances warranted; the fact being that they were made more favorable than they should have been, and the possibility being that, unless there had been some provision distinguishing the act from an outright act of sale, the plaintiff would have refused to sign it.
Among the considerations which lead to the conclusion thus stated are the following: The defendant Powell had made an offer (which, being in writing, he could not and does not deny) to relieve plaintiff’s property from the incumbrances resting on it, to operate it as a turpentine orchard, and to make that business profitable to the plaintiff, and there is nothing to show why, instead of accepting the offer so made, plaintiff should have made the less favorable contract, selling his land for less than half its market value, and thereby losing probably $6,000 or $8,000.
Under the ruling of the district court, the only evidence as to terms of the contract agreed on, save that of plaintiff and defendant A. B. Powell, was to all intents and purposes in the possession of Powell; that is to say, it was left to him to determine whether his legal adviser (a respected member of the bar of this court, and the only other witness having direct cognizance of the matter) should testify or not, and as defendant objected to his testifying, and thereby withheld his evidence, the presumption in this court is that, if produced, the evidence would tell against him. It is shown, without attempt at contradiction, that after the execution of the act of October 4, 1905, and, as we infer, after defendant had paid the mortgage and judgment debts that he had agreed to pay, plaintiff wrote him on several occasions with reference to the execution of the additional writing that had been agreed on, and that defendant took no notice of his letters. He does not, however, explain in his testimony why he failed to repudiate the claim or pretension asserted in those letters — that there was something further to be done — nor does he explain why it was that during that time he sent plaintiff $250 and wrote to him, “Please show Mr. Vickers- over your land” [meaning the identical land which he now pretends belonged to him]. As to the defendant M. D. Powell, we think it established that he was either a person interposed *429 by A. B. Powell, or else that he and A. B. Powell (his nephew) had a common interest in the matter, and co-operated to defeat any effort that plaintiff might make to vindicate his rights. Apart from that, the record did not show a sale from plaintiff to A. B. Powell, and, if M. D. Powell purchased the property in question from A. B. Powell, he must be presumed to have done so with knowledge of that fact. The same thing may he said of M. E. Vickers, who appears to have been not unwilling to participate with the Powells in their attempt to obtain an unfair advantage of the plaintiff. Moreover, he was distinctly warned by plaintiff, before he consummated his trade with the Powells, that he, plaintiff, had not sold his land. The judge a quo has given the plaintiff no more than he is entitled to, and, as between the defendants, appellants herein, there is no complaint of the judgment appealed from, which is accordingly affirmed.