**187 So. 801**

### SUCCESSION of BONNER.

No. 35151.

March 6, 1939.

Rehearing Denied April 3, 1939.

Clifton F. Davis and Melvin F. Johnson, both of Shreveport, for appellant Arthur Childers.

Albert P. Garland, Elmo P. Lee, Jr., and Lee & Lee, all of Shreveport, for appellees.

HIGGINS, Justice.

Arthur Childers filed a petition, alleging that Jennie Bonner died in Shreveport on January 9, 1938; that an application for the administration of her estate was made by an alleged collateral heir, but abandoned; that on February 8, 1938, the succession of the deceased was opened and certain parties claiming as heirs on allegations of intestacy were, ex parte, sent in possession of the estate as heirs; that a will had been found recently dated July 14, 1937, in private nuncupative form, in which

the petitioner was named as executor, and he prayed that the will which he presented and filed should be probated and notice given to the parties claiming to be heirs under the judgment placing them in possession.

The defendants, who were the natural brothers and sisters of the deceased and who had been recognized as her heirs in the judgment, filed an opposition to the application, denying that the will was made by Jennie Bonner, and averring that it was written after the date of her death and was spurious.

After trial, there was judgment rejecting the application to probate the will, declaring it a forgery and ordering the lis pendens notice cancelled.

The applicant filed a motion for a new trial on the grounds of newly discovered evidence and attached affidavits, covering same, and, over his objection, the court permitted opponents to file an opposition to the motion, supported by affidavits, and then overruled the motion for a new trial.

Applicant filed a petition for an appeal, alleging that the attorneys for the collaterals held a transfer of one-half of their claims and, since the judgment, they also acquired the remainder of the interests claimed by these parties, and prayed that notice be served upon the attorneys and the parties. The appeal was perfected.

The plaintiff objected to the defendants introducing any evidence on the ground that they had not averred they had any interest in the succession of the deceased. Counsel for the respondents pointed out

that in the proceedings where the defendants were recognized as the legal heirs of the deceased, they had alleged and proved that they were half-blood natural brothers and sisters and the children of predeceased half-blood natural brothers and sisters of Jennie Bonner, and, as such, her legal heirs; and, as they were in possession of the estate, which plaintiff, under the will, was claiming against them, it sufficiently appeared that they had an interest in the litigation and a right to stand in judgment. However, counsel also asked the court for permission to amend his answer so as to make these averments of fact and the court, over plaintiff's counsel's objection, ordered this to be done.

In support of the allegations of the supplemental answer, defendants offered in evidence the testimony of the witnesses taken in the succession proceeding where these parties were recognized as legal heirs, and counsel for the plaintiff admitted that these witnesses would testify to the same facts if produced as witnesses in this case. This evidence shows that Jennie Bonner, a natural child, died leaving no ascendants or descendants or lawful relatives other than the opponents, who are the half-blood natural brothers and sisters and children of predeceased half-blood natural brothers and sisters of Jennie Bonner. Therefore, under the express provisions of Article 923 of the Revised Civil Code, these parties were the legal heirs of the deceased and had an interest in this matter.

Counsel for the plaintiff filed an exception of nonjoinder of parties, claiming that the respondents should have made the other legatees under the will parties litigant. The transcript shows that the plaintiff, as executor, under the alleged will instituted this suit against the defendants, who had been recognized as legal heirs and placed in possession. They merely came into court and defended their rights against probating the will. The interests of the other alleged legatees under the will were identical with those of the plaintiff and they were apprised of the litigation but refrained from participating therein. Plaintiff cannot complain that these parties were not before the court as it was more his duty to bring them in than the defendants.

The next question in the case is one of fact as to the validity vel non of the purported will. Counsel for the proponent argue that the trial judge committed manifest error in disbelieving and rejecting the testimony of his witnesses and accepting the defendants' evidence. The attorneys for the defendants contend that the trial judge's conclusions are unquestionably supported by the overwhelming preponderance of the evidence.

The record shows that Jennie Bonner was a mulatto woman, who married and had a child, and that her husband and child both died a number of years ago. She became the concubine of a white man, Ben Oliver. He acquired considerable real estate, taking title to some of it in his own name and the balance in Jennie Bonner's name. He died in 1936, leaving a will in which he made Jennie his sole legatee. His relatives filed suit to annul the bequest, because she was his concubine. The case was compromised by a division of the property between

the heirs of Oliver and Jennie. In this settlement, Jennie was represented by J. Bennett Johnston, attorney-at-law, and was advised and assisted by Jim and Arthur Childers, two white men, the latter becoming her rent collector, who generally looked after her property. After her death on January 9, 1938, her succession was opened and the defendants were recognized as her legal heirs and sent into possession of her property in an ex parte proceeding. Arthur Childers, through an attorney, made claim against the estate for the sum of $8,-000 for services rendered, which claim was denied by the defendants.

On March 17, 1938, Arthur Childers, the executor and one. of the universal legatees under the purported will, filed the present proceeding to have the will probated and executed. The testament is in nuncupative form by private act and names Arthur Childers as executor, with seizin and without bond, and Arthur and Jim Childers (brothers), as universal legatees. A special bequest of a house and lot on Wood Street was made to Hannah Brown.

There were seven witnesses to the will—E. G. Roland, Ed. Sorrell, E. E. Lindsey and N. M. Kelley, white men, and J. W. Jackson, B. B. (Brad) Burton and George Mayhorn, colored, who all testified that Jennie Bonner dictated the will to E. G. Roland, who wrote it out in his own handwriting, as dictated, and that she affixed her signature by mark, being unable to read or write, and the other witnesses placed their signatures thereto.

Roland states that he is a resident of Bossier Parish, La.; that during the month of June, 1937, he came to Shreveport, La., from Houston, Texas, and went to Daley Brown's Store on a Sunday morning, trying to find someone who would ride him to his home, which was a distance of about fifteen miles away; that Arthur Childers drove up to the store in his automobile and agreed to drive him home after he had finished collecting rents; that, in the meantime, Arthur took him to Jennie Bonner's home on Christian Street, in Shreveport, where he sat on the front porch, in a swing, while Arthur went off to collect the rents; that while there, Jennie asked him (Roland) to go to Tom Robertson, Attorney, and get him to come and write her will; that he told Jennie that he would do so the next time he was in town; that Jennie told him she was going to leave her property to Jim and Arthur Childers; that he never mentioned the matter to Arthur Childers when he rode back home with Arthur in his car that day; that this was the first and only business that Jennie ever asked him to attend to for her; that sometime later, he went to see Tom Robertson about writing the woman's will, and that the attorney stated he would write it for $150, but that Jennie Bonner was too stingy to pay that amount, and that he said, however, "I can fix you a draft, Roland, so you can write this will just as well as I can"; that the next time he came to town, he told Jennie of his conference with the attorney, and she instructed him to go back and get the draft and come and write her will; that he went to the attorney's office in the Giddens-Lane Building and Mr. Robertson drafted the form of the will in his own handwriting, after consulting some law

books, but that he did not copy the proposed form of will from the books; that Mr. Robertson's handwriting was so bad he could not read it, and that with Mr. Robertson's assistance, he (Roland) copied the form of the will in his own handwriting; that Mr. Robertson did not charge him any fee for his services; that on the 14th day of July, 1937, about noon, he secured the several witnesses to the will, some of whom were found at Daley's Store, where they spent their leisure time, and they met at Jennie's house on Christian Street, where she dictated the will to him and he wrote it down for her on a piece of paper, copying the form furnished by the attorney Robertson, using a ledger book on his lap as an improvised writing table, and, after it was completed and signed, he left the document with Jennie; that he subsequently visited Jennie, and she requested him to keep the will at his house, because she feared that it might be destroyed by fire if it remained at her home; that he took the will and locked it in a wooden box and kept it at his house until after Jennie's death; that he lived in a rural section where there was no fire protection; that he did not tell either Jim or Arthur Childers about the will; that although Jennie's death took place on January 9, 1938, he did not hear about it until the middle of February, 1938, and he then told Arthur Childers about the will; that Arthur laughed at his statement and refused to believe it; that, in accordance with Jennie's instructions, he refused to give Arthur Childers the will, but agreed to deliver it to the attorney who was to handle her estate; that he delivered the will to a Mr. Comegys of the

firm of Comegys and Cummings, attorneys (who represented Arthur Childers in presenting his claim for $8,000 against the estate); that he read in the newspapers the death notice of Attorney Robertson, who died before Jennie, and that neither Jim (J. E.) nor Arthur Childers ever gave him a copy of the Wash Morman will, nor had he ever seen a copy of it; that on March 4, 1938, the will was handed to Melvin F. Johnson, the attorney who interviewed the witnesses, and filed the present petition for the probate of the will on March 17, 1938.

On cross-examination, documents written in the handwriting of Mr. Robertson, who died about two weeks before Jennie, were produced, and the witness read them without difficulty and was unable to identify the handwriting. On being apprised that these papers contained the handwriting of Attorney Robertson, the witness stated that he accounted for the attorney's poor penmanship on the day he drafted the proposed form of will, because Robertson had been drinking intoxicating liquors.

The other witnesses to the will testified that they were requested by Roland to go to the home of Jennie Bonner about 12:10 o'clock noon on July 14, 1937, in order to witness her will and that they met there; that Jennie dictated the will and Roland wrote it down as she dictated it; and that she signed her name by mark and they also signed the will. Some of them said that she made the mark, others said that she merely touched the pen; some of them said that Roland referred to a paper, while writing the will, others did not see him do

so; some of them stated that Jennie said she wanted to leave her property to her two boys, Jim and Arthur Childers, because she got the property from a white man and wanted it to go back to white people; some of them stated that she was "tongue-tied" and others did not notice this impediment in her speech.

Arthur Childers, plaintiff, was called for the purpose of cross-examination, under the Act No. 126 of 1908, and stated that he was surprised when Roland informed him that Jennie Bonner had left a will in which she bequeathed most of her property to his brother, Jim, and himself; that he thought she left a will but was unable to find it, being under the impression that either Tom Robertson or George McSween, attorneys, had it; that Jennie, in the spring of 1937, said she was going to remember him in her will and wanted Tom Robertson to make the will for her; that Mr. Robertson had not represented her for many years; that he did not know anything about the suit entitled Laura Jefferson v. Mary and J. E. Childers, 189 La. 46, 179 So. 30; that he had no interest in that matter and his brother did not discuss it with him; he denied, emphatically, having testified in the case, but, upon being confronted with the record, admitted that he was a witness but stated that there were two cases by Laura Jefferson against his brother and he had testified in only one of them; that he made a claim against Jennie's estate for $8,000 for services since 1935, because he did some carpentry work, bought groceries and goods for her, attended to the purchase of paint and paper to be used

on her property and collected rents amounting to approximately $100 per month, the usual collection commission being 5% to 10%; and that Jennie furnished all expense money. Upon being shown certain documents, he admitted that he and his brother, from time to time, borrowed money from Jennie all of which they repaid, except the sum of $50.

The respondents introduced the testimony of Isaac Abramson, who stated that he was the attorney for Laura Jefferson in her suit against J. E. Childers et al., supra; that there was only one suit and that on the trial of the case Arthur Childers not only testified in behalf of his brother, but was present in the court room throughout the trial.

J. Bennett Johnston, an attorney who represented Jennie Bonner in different matters and received the sum of $2,200 in fees for services, testified that the deceased had never informed him that she had made a will.

Counsel for respondents also introduced in evidence checks dated in 1936 and 1937 to the order of George T. McSween, attorney, from the deceased, amounting to the sum of $720, covering fees for legal services rendered to her.

Ed Robertson, the son, and Sidney Heatherwick, the former secretary of the deceased attorney, Tom Robertson, testified that they did not see Roland on the two occasions when he is said to have visited Mr. Robertson's office and consulted him about drafting Jennie's will, and that, if he had visited the office, they were confident

they would have seen him or known about the visits; that the deceased attorney was not in any financial condition to donate his services to parties who were able to pay; and that when he indulged in the use of intoxicating liquors, it was his custom and habit to remain away from his office and not undertake any legal work.

Dr. D. H. Alverson and J. Bennett Johnston, the physician and the attorney for Jennie Bonner, respectively, testified that the deceased had an impediment in her speech and moaned and groaned while talking.

N. L. Clark, a witness for the plaintiff, stated that E. L. Roland lived in a tent on the witness' property for the last year and a half and had never slept in his (Clark's) house.

S. B. Pearce, defendants' witness, testified that he handled the insurance business of Jennie Bonner and about a month before she died, she told him she had not made any will and that she was about to dispense with the services of Arthur Childers.

Three colored men stated that they were engaged in demolishing a house across the street from Jennie's home on July 11, 12, 13 and 14th, 1937, and ate their lunch between twelve and one o'clock under an oak tree, directly in front of her home; and that they did not see any group of men going to Jennie's about noon on July 14, 1937.

Two colored women, who were immediate neighbors, testified that they were home during the day of July 14, 1937, and did not see several men visit Jennie's house, and that she never entertained more than two or three visitors at a time.

Defendants' attorney, by cross-examination as well as other evidence, showed that all except one of the plaintiff's witnesses had at one time or another run afoul of the law and that some of them were regular visitors at Daley Brown's Grocery Store.

Respondents also introduced the testimony of other witnesses to show the bad general reputation of several of the plaintiff's witnesses for truth and honesty.

W. H. Hodges, Jr., D. C. Elston, Bossier Parish planters, and Jim Mercer, president of the Police Jury of Bossier Parish, reputable and successful white business men, testified that Arthur Childers' reputation for truth and veracity was very bad.

W. B. Williams, a notary public and public stenographer, stated that he made a copy of the Wash Morman will in the latter part of 1937 for W. B. Massey, attorney, who was employed to check the validity of the testament; that in December, 1937, he gave a copy of it to Claude Prothro, an attorney, who expected to be employed by the Morman heirs; that later J. E. (Jim) Childers came to see the witness at his office and requested that he outline a will for a negro woman named Bonner, who had recently died, but he declined to have anything to do with it; that, subsequently, Jim Childers came back to discuss the matter and the witness showed him a typewritten copy of the Morman will, which is a nuncupative will by private

act, signed by mark, and Childers took it away with him, promising that the witness would receive about $250.

C. B. Prothro, attorney, testified that Williams had brought a copy of the Wash Morman will to his office in December, 1937.

W. W. McDonogh, an attorney, stated that W. B. Williams acted as his stenographer and that between November 20th and 23rd, 1937, Mr. Blanton of Homer, La., and a negro came to see Mr. Williams about a will, which, Mr. Massey, the attorney, stated could not be broken.

Lamont Seals, an attorney of Homer, La., when shown a certified copy of the Wash Morman will, stated that he prepared the will for the testator, copying some of it from a book, but said "there are portions of the will that are original composition with me."

The Williams' copy of the Wash Morman will and the purported will of Jennie Bonner were introduced in evidence and the same errors that Williams made in taking down his shorthand notes and transcribing them from the dictation of the attorney, Massey, of the Wash Morman will appeared in the purported Jennie Bonner testament.

■ Frank Blanchard, an attorney, testified that J. E. (Jim) Childers approached him several times and stated that he wanted to consult him about a big piece of business; that Childers came to his office and cautiously stated that Jennie Bonner, a negro woman, had died, leaving only some sisters, but did not leave a will, and Childers proposed that they confect a will for the deceased, naming Childers and his brother, Arthur, as beneficiaries, after leaving one piece of property to a particular person; that he pointed out that it was legally impossible to do this and Childers replied that there was about $40,000 in the matter; that when he told Childers that he would have to have from five to seven witnesses to the will, Childers said "I have got them or can get them"; and that this happened in the latter part of January or the beginning of February, 1938.

■ Counsel for plaintiff objected to the testimony of Frank Blanchard on the ground that Jim Childers' statements to him were privileged, being a matter between an attorney and his client. The law is clear that a person attempting to engage a lawyer for an illegal purpose is not entitled to the privilege of having the matter kept confidential. 70 C.J. 418. Furthermore, Mr. Blanchard stated that he refused to accept employment by Mr. Childers and, therefore, the relation between client and attorney did not come into existence. Lange, et al. v. Richoux, et al., 6 La. 560; Briggs v. McLaughlin, 134 La. 133, 63 So. 851; Perkins v. Brownell-Drews Lumber Co., 147 La. 337, 84 So. 894; Taylor v. Allen, 151 La. 82, 91 So. 635; Murdock v. Potter, 155 La. 145, 99 So. 18; Succession of Corsey, 171 La. 663, 131 So. 841; Fennell v. United States, 5 Cir., 67 F.2d 768.

Defendants' counsel asked that a bench warrant issue instanta for J. E. (Jim)

Childers, and the next day the sheriff reported that Childers was sick in Dr. Gowen's Sanatorium—but that Childers never appeared nor was a continuance asked for or any effort made to take his testimony by deposition.

An attack is made on the testimony of W. B. Williams on the ground that he was willing to participate in a fraud and that the trial judge stated he would not accept his testimony uncorroborated. The learned trial judge apparently gave credence to Williams' story, because it was amply supported by other reliable evidence in the record.

It is argued that the district judge arbitrarily disregarded the plaintiff's witnesses' testimony. This contention is not sound, because our learned brother below had many good reasons for disbelieving the testimony of the plaintiff's witnesses. They tell a most extraordinary story. For instance, the plaintiff, Arthur Childers, said that in the Spring of 1937, the deceased promised to leave him something in her will, but laughed at Roland when informed that Roland had in his possession Jennie's will. Roland stated that Jennie told him she did not want either Arthur or Jim Childers to know about the will until after her death. Roland's statement that Jennie requested him, a mere acquaintance, to undertake this important matter for her, not through her regular attorney, and to retain the will in his custody, without the knowledge of her alleged confidential advisors, was most unusual, to say the least. In passing, we might say that Roland was unable to remember on what floor Mr. Robertson's office was located, although he visited his office twice. The delay in producing the will under the circumstances of this case was incredible. J. E. Childers and the operators of Daley Brown's Grocery Store testified in support of a transaction, which was set aside by this Court on the grounds of fraud, in the case of Jefferson v. Childers, 189 La. 46, 179 So. 30.

Certainly, it cannot be said that the trial judge acted unreasonably in dismissing the plaintiff's suit, when he made no effort to contradict the damaging testimony of the attorney, Frank Blanchard, whose statements, as those of W. B. Williams, were corroborated in many respects by the evidence and testimony of other witnesses, and the almost identical likeness between Williams' typewritten copy of the Wash Morman testament and the purported Jennie Bonner will.

Our conclusion is that the trial judge was not only justified in rejecting the plaintiff's evidence, but that he was eminently correct in doing so. The trial judge properly overruled the motion for a new trial, as it appears that the plaintiff knew, or by the exercise of reasonable diligence could have discovered, the alleged new evidence.

For the reasons assigned, the judgment is affirmed at appellant's costs.

O'NIELL, C. J., concurs in the decree.