493 So.2d 1178 (1986)
STATE of Louisiana
v.
Billie A. GREEN.
No. 86-K-0197.
Supreme Court of Louisiana.
September 8, 1986.
Robert Roux, Alton Moran, David Price, Office of the Public Defender, for applicant.
*1179 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Bryan Bush, Dist. Atty., Kay Kirkpatrick, Asst. Dist. Atty., for respondent.
COLE, Justice.
This case involves the scope of La.R.S. 15:475,[1] Louisiana's statute governing the attorney-client privilege in the criminal law context. Prior to argument, we consolidated this case with the case of State v. Taylor, 483 So.2d 1007 (La.1986), rehearing granted 485 So.2d 58 (La.1986). We will treat the cases separately and render an opinion in each.

FACTS
On June 27, 1984, Billie A. Green, a forty-four year old male and two friends were sitting in Green's van which was parked in his driveway. Around midnight three L.S.U. students, after having frequented the Bengal Lounge, approached the Green's house on the way to their car. Two of the youths began to urinate on the lawn and as a result an argument erupted between the youths and Green's companion, Ms. Early. At some point Green became involved in the argument and a fist fight broke out between him and the third youth, Robert Jones. During the altercation both Green and Early suffered bruises and scratches, and had their clothes torn. Jones withdrew when, according to one of his friends, Green was on his knees and could not take anymore. There is conflict in the testimony relative to the possession of a knife during the fight. Both Green and Early testified one of the youths had a knife and had cut Early and attempted to stab Green. All other witnesses testified they were unaware of any person having a knife.
After the initial altercation, Jones went to retrieve the car. By the time Jones returned with the car to pick up his friends, Green had armed himself with a 9 MM automatic pistol. At this point it is disputed whether Jones tried to run down Green. At any rate, Green fired once directly into the hood of the car. Seconds later he moved around to the driver's side, broke the window with the butt of the gun and fired once into the car wounding Jones in the jaw and neck.
Following the shooting, Green and Early drove to New Orleans where he called a Baton Rouge attorney, Mike Walsh. Green related the details of the incident and sought advice on how to give himself up to authorities. At Walsh's request, the couple returned to Baton Rouge and met with Walsh in his office. Green left with Walsh a box containing various items, being afraid to leave the items in the van and wanting to keep them in a secure place. Thereafter, Walsh accompanied Green to the police station where he was booked for attempted second degree murder. Walsh enrolled as counsel of record in the case.
At some point after Green's arrest, Walsh came across a 9 MM automatic pistol among the clothes, documents and personal effects left in his office by Green for safekeeping. Walsh contacted authorities and turned over the weapon. Later tests confirmed it was the gun used in the shooting.
The following year, after Walsh had been permitted to withdraw as counsel, the state subpoenaed him for the March 7, 1985 trial. Apparently the state was seeking to elicit from Walsh details which would prove the connection between Green and the gun. A motion was filed to quash the subpoena on the basis any disclosure would violate the attorney-client privilege. The matter was set for hearing. At the hearing, the state assured the trial court it had no intention of delving into privileged matters.[2]
*1180 The trial court rejected defense contentions (1) the state was abusing the subpoena process and (2) such testimony would irreparably prejudice jurors against Green. In the court's view the attorney-client privilege simply did not encompass physical evidence; accordingly, the trial court denied the motion. Thereafter at trial Walsh was called by the state and, despite prior assurances by the prosecutor and over renewed defense objection, testified he had represented Green, he had received a gun from Green and he had turned the gun over to the police. While Walsh did not recognize the gun shown him by the prosecutor, he agreed it was of the same type as the one given him by Green. The jury found defendant guilty of the lesser included offense of attempted manslaughter. On appeal the First Circuit rejected as without merit defense complaints with respect to calling Walsh to the stand. In affirming the conviction, however, the court vacated the sentence as improper. State v. Green, 484 So.2d 698 (La.App. 1st Cir.1985). Currently Green is awaiting resentencing.
We granted writs on application of the defendant to review the correctness of the lower courts' rulings on (1) the admissibility of the gun and (2) Walsh's taking the stand, both alleged to be in error as violations of the attorney-client privilege. 486 So.2d 728 (La.1986).

ATTORNEY-CLIENT PRIVILEGE
The inception of the attorney-client privilege can be traced to the reign of Elizabeth I where the privilege already appears unquestioned. 8 Wigmore, Evidence, § 2290 (McNaughton rev. 1961). "It is the oldest of the privileges for confidential communications known to common law." Upjohn Co. v. United States, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). The privilege is designed to promote full disclosure from the client to his attorney as to all relevant facts and information related to the subject matter of the representation. La.R.S. 15:475; La. C.C. art. 2283 (prior to the Obligations Revision, 1984 La.Acts, No. 331). The purpose of the privilege is to "encourage the client to confide fully in his counsel without fear that his disclosures could be used against him by his adversaries." State v. Rankin, 465 So.2d 679 (La.1985).
"... As a practical matter, if the client knows that damaging information could more readily be obtained from the attorney following disclosure than from himself in the absence of disclosure, the client would be reluctant to confide in his lawyer and it would be difficult to obtain fully informed legal advice...." Fisher v. United States, 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1976).
Rankin, supra, and authorities cited therein.
It is evident the attorney-client privilege, an evidentiary rule prohibiting disclosure by the attorney of the confidences of the client, see Clutchette v. Rushen, 770 F.2d 1469 (9th Cir.1985), is client-centered. It is a purely personal privilege which can only be set up by the person in whose favor the right existsthe client. La.R.S. 15:478 (1981); State v. Vassel, 285 So.2d 221 (La. 1973) (The attorney-client privilege was inapplicable where the client rather than the attorney testified.); State v. Johns, 209 La. 244, 24 So.2d 462 (1946). Therefore, it is only the client which may waive the privilege. La.R.S. 15:475, 478; State v. Schmitt, 354 So.2d 1339 (La.1978).
In criminal cases, the scope of the attorney-client privilege is governed by the terms of La.R.S. 15:475 and before a client may claim the benefit of the privilege, the prerequisites set forth in that section must be met. See Rankin, supra. Under section 475 a court must determine:
(1) There was an attorney-client relationship. Employment of an attorney is sufficiently *1181 established when it is shown the advice and assistance of the attorney are sought and received in matters pertinent to his profession or when the agreement of representation has been made under conditions acceptable to both parties. See McDaniel v. Department of Safety & Permits, 270 So.2d 290 (La.App. 4th Cir.1972). What is critical here is a person must seek legal advice from a professional legal adviser acting in his capacity as such. 8 Wigmore, Evidence, § 2294-2300; compare State v. Spell, 399 So.2d 551 (La.1981) (Information given by the defendant to a fellow inmate assigned to the law library to help other prisoners was not covered by the privilege.).
(2) The communication, information or advice is made in confidence. Of paramount concern is whether the client has made the disclosure with some reasonable expectation of confidentiality. See Tubesales v. Champion Machine Works, Inc., 281 So.2d 459 (La.App. 4th Cir. 1973). As a general rule, though not absolute, the moment confidence ceases, as is the case when the client's disclosure is made in the presence of a third party, the privilege ceases. U.S. v. Blackburn, 446 F.2d 1089 (5th Cir.1971); Rankin, supa (dealing with plea bargains); Rester v. Powell, 120 La. 406, 45 So. 372 (1907); compare U.S. v. Bigos, 459 F.2d 639 (1st Cir.1972) (The presence of a third party is not an absolute bar to the privilege but merely indicative of the client's intention not to have the communication kept confidential. The trial court has discretion.); 8 Wigmore, Evidence, § 2311 et seq.

(3) The communication or information by the client and/or the advice given by the attorney in response is sufficiently connected to the representation. Here a court is concerned with the scope of the privilege. The test is whether the statement is made as a part of the purpose of the client to obtain advice on the subject. 8 Wigmore, Evidence, § 2306 et seq. For examples of situations where courts have found no privilege exists, see State v. Pike, 343 So.2d 1388 (La.1977); State v. Hayes, 324 So.2d 421 (La.1975), cert. denied 425 U.S. 962, 96 S.Ct. 1747, 48 L.Ed.2d 207 (1976); Jackson v. State, 155 Tenn. 371, 293 S.W. 539 (1927) (Casual remarks on unrelated subjects are generally not within the scope of the privilege.).
All three elements must be present before the privilege may be claimed. See In Re Grand Jury Proceedings, 663 F.2d 1057 (5th Cir.1981), vacated on other grounds 680 F.2d 1026 (5th Cir.1982); New Orleans Saints v. Griesedieck, 612 F.Supp. 59 (E.D. La.1985), for a general discussion of the necessary elements for the invocation of the attorney-client privilege.
The right of the client to prevent his attorney from disclosing matter covered by the attorney-client privilege arises at the inception of the attorney-client relationship, and this right extends to all matters made in confidence and determined to be sufficiently connected to the representation. See In Re Grand Jury Proceedings, supra. Further, the privilege does not generally cease with the cessation of the relationship. Any privileged client disclosures made during a prior representation nonetheless remain covered by the privilege after termination of the prior relationship. La.R.S. 15:475.
Although the attorney-client privilege is deeply rooted in common law and made applicable in Louisiana by virtue of its codification in La.R.S. 15:475, the privilege is not without exception. See In Re Kohn, 357 So.2d 279 (La.App. 4th Cir.1978); Eagle Industrial Assoc., Inc. v. Universal Oil Corp., 277 So.2d 720 (La.App. 2d Cir.1973). As Professor Wigmore points out:
Nevertheless, the privilege remains an exception to the general duty to disclose. Its benefits are all indirect and speculative; its obstruction is plain and concrete.... It is worth preserving for the sake of a general policy, but it is nonetheless an obstacle to the investigation of the truth. It ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle. *1182 8 Wigmore, Evidence § 2291 (footnote omitted). While we do not attempt to develop an exhaustive and exclusive list of exceptions to the doctrine of attorney-client privilege, suffice it to say the privilege does not generally exist:
(1) Where the client expressly consents to the disclosure. La.R.S. 15:475, 478.
(2) Where the representation is sought to further criminal or fraudulent conduct either past, present or future. See e.g., In Re Grand Jury Proceeding, supra; In Re Grand Jury Proceedings in the Matter of Fine, 641 F.2d 199 (5th Cir. 1981); Johns, supra; State v. Childers, 196 La. 554, 199 So. 640 (1940); Succession of Bonner, 192 La. 299, 187 So. 801 (1939).[3] Here the emphasis should be placed on the client's actions, since it is the client's right which is prejudiced. McCormick on Evidence, § 89 (Cleary ed. 3rd.) Unilateral acts by the attorney while perhaps constituting violations of criminal law and/or ethical canons generally cannot be held to abrogate the client's privilege.
(3) Where disclosure is mandated by law or court order. See e.g., In Re Ryder, 263 F.Supp. 360 (E.D.Va.), aff'd 381 F.2d 713 (4th Cir.1967); In Re Price, 429 N.E.2d 961 (Ind.1982); In Re Shamy, 73 N.J. 187, 373 A.2d 655 (1977); In Re Kerr, 86 Wash.2d 655, 548 P.2d 297 (1976); A.B.A. Informal Opinion, 1057 (August 12, 1968).
In the area of attorney-client privilege, lawyers should be guided by the Ethical Considerations and Disciplinary Rules of the Louisiana State Bar Association's Code of Professional Responsibility (see Title 37, Chapter 4Appendix, of the Revised Statutes), specifically Article XVI of the Articles of Incorporation of the Louisiana State Bar Association; vis-a-vis their rights and obligations as regards client communications, information or actions. Professional responsibility does not countenance the use of the attorney-client privilege as a subterfuge and all conspiracies, either active or passive, which are calculated to hinder the administration of justice will vitiate the privilege.

ADMISSIBILITY OF THE GUN (i.e., physical evidence)
In this case we are faced with two distinct problems: (a) the admissibility of the gun (i.e., physical evidence), and (b) the questioning of the attorney relative to the gun. The former will be addressed here. As to the gun, we point out attorney Walsh acted properly under the circumstances which confronted him in delivering the weapon to authorities.
Walsh was under an obligation to give the gun to authorities. See Disciplinary Rules 1-102(A)(5) (barring a lawyer from engaging in "conduct that is prejudicial to the administration of justice"); 7-102(A)(3) (prohibiting an attorney from concealing or knowingly failing to disclose "that which he is required by law to reveal"); 7-102(A)(7) (prohibiting an attorney from counseling or "assist(ing) his client in conduct that the lawyer knows to be illegal or fraudulent"). Additionally, had Walsh failed to deliver the gun to authorities he may have been subject to criminal prosecution. See La.R.S. 14:130.1 (Supp.1986) (the "Obstruction of Justice" statute).
We hold the gun is not excludable by operation of the attorney-client privilege since Walsh was under an obligation to turn over evidence which he reasonably believed to be material to the crime charged or to the investigation of a crime. See In Re January 1976 Grand Jury, 534 F.2d 719 (7th Cir.1976); Anderson v. State, 297 So.2d 871 (Fla.App. 2d Dist.1974); In Re Ryder, supra; State v. Olwell, 64 Wash.2d 828, 394 P.2d 681 (1964).
*1183 Our holding is strengthened by the fact the gun, as an instrumentality of a crime, could have been seized from the defendant were it still in his possession. La.C.Cr.P. art. 161 (1967). The same item would not have been immune from introduction into evidence merely because it was in the hands of an attorney. La.R.S. 15:43 (Supp. 1986).[4] As Professor McCormick points out:
(I)f a document (or other piece of physical evidence connected to a crime) would be subject to an order for production if it were in the hands of the client, it would be equally subject if it is in the hands of the attorney.
McCormick on Evidence, § 89 (Cleary ed. 3rd). If our holding were any different, we would be sanctioning attorneys acting as nothing more than conduits for the "laundering" of relevant evidence material to criminal prosecutions.

THE MOTION TO QUASH SUBPOENA
Our holding as relates to the gun's admissibility does not answer the question about the propriety of interrogating Walsh, Green's former attorney, relative to the gun. Although the gun is not excluded under the attorney-client privilege, it nonetheless is not competent evidence unless the state can show a connection to the defendant through "authentication." La. R.S. 15:435, 441 (1981); State v. Robertson, 421 So.2d 843 (La.1982); State v. Davis, 336 So.2d 805 (La.1976); State v. Foret, 196 La. 675, 200 So. 1 (1941); 7 Wigmore, Evidence, § 2129 (3d ed. 1940). While the state need not positively identify the weapon as the one used in the crime, and the issue of identification is a question of weight rather than admissibility, the state nonetheless must lay a proper foundation prior to its admission. Robertson, supra. The foundation or "authentication" may either be visual or by chain of custody. See State v. Starks, 471 So.2d 1029 (La.App. 1st Cir.1985). If the authentication is by chain of custody, the state to meet its foundation requirement must show it is more probable than not the object is the one connected to the case. State v. Andrews, 369 So.2d 1049 (La.1979); State v. Drew, 360 So.2d 500 (La.1978), cert. denied 439 U.S. 1059, 99 S.Ct. 820, 59 L.Ed.2d 25 (1979). In an effort to lay the proper foundation the state has attempted to elicit information from Walsh which would connect the gun to Green.
In support of its right to call the attorney, the state argues the testimony of the attorney in this case is not privileged since no verbal communication was involved. Additionally the state argues even assuming the delivery of the gun to Walsh was a privileged event the attorney-client privilege is inapplicable since Walsh did not receive the items by virtue of his being a "legal adviser." These arguments are without merit.
La.R.S. 15:475 prohibits the legal adviser from disclosing, without his client's express consent, three things. He may not disclose any "communication" made by or on behalf of his client. Secondly, he may not disclose any "advice" given by him to his client. Thirdly, he may not disclose any "information" he may have gotten by reason of his being such legal adviser. In the application and construction of law we are told the words of a law are generally to be understood in their most usual signification, without attending so much to the niceties of grammar rules as to the general and popular use of the words. La. C.C. art. 14. Adhering to this precept and being aided by the definitional treatment of Websters Third New International DictionaryUnabridged (1970), we believe the word "communication," as used in La.R.S. 15:475 refers logically and basically to spoken or written transmissions of thought. A variety of modes may be involved, such as verbalized language, signs, gestures, letters or other writings, or the use of modern technological *1184 devices. "Advice," a recommendation regarding a decision or course of conduct, may be imported, conveyed or transmitted in like manner. The term "information" must have been intended to cover subject matter not otherwise included in the categories of "communication" and "advice." To find otherwise would give no meaning to the term "information." Statutorily, there is no limitation on the source or manner in which the "information" is received. Variously, Webster defines "information" as the reception of knowledge or intelligence; knowledge communicated by others; knowledge of a particular event or situation; and, the process by which the form of an object of knowledge is impressed upon the apprehending mind so as to bring about a state of knowing.
This Court is mandated to give meaning to legislative pronouncements and is not at liberty to interpret a statute in such a manner which would effectively read out a portion thereof. Groves v. Board of Trustees of Teach. Retire.Sys., 324 So.2d 587 (La.App. 1st Cir.1975), writ denied 326 So.2d 378 (La.1976); Chappuis v. Reggie, 222 La. 35, 62 So.2d 92 (1952); Op.Atty. Gen., 1942-44, p. 994.
In the context of the facts now under consideration it is clear the "information" sought by the state from Walsh was his knowledge of Green's possession of the gun prior to its surrender to the police authorities. See Clutchette v. Rushen, supra. We hold it was error for the trial court to allow the state, over objection, to interrogate Walsh relative to the gun. The interrogation resulted in the disclosure of "information" Walsh received. To allow the state to adduce this evidence in this manner does violence to the fundamental concept of the attorney-client privilege. Anderson, supra. We hold further Walsh was indeed Green's "legal adviser." The contention of the state to the contrary does not comport with the facts.
When Green called Walsh in Baton Rouge from New Orleans he sought advice on how to submit himself to the custody of the police. His meeting with Walsh in the latter's office could be for no purpose other than using the professional help of the attorney. Walsh had known Green for a number of years and was handling an employment compensation matter for him. He enrolled as counsel of record in the criminal proceeding and remained as such through at least July 6, 1984. On that date Green wrote to Walsh, discharging him from the case. Walsh incorporated this information into a motion to withdraw, which the trial court signed July 13, 1984. Thus Walsh became Green's "legal adviser" immediately after the incident giving rise to the criminal charge and remained so for a period in excess of one year. The fact Green left the box containing the gun with Walsh for security or safekeeping does not diminish Walsh's status as such, nor does it convert Walsh into a simple depositary thus negating the applicability of R.S. 15:475.
Our holding today mandates the state prove the connection between a piece of physical evidence and the defendant without in any way relying on the testimony of the client's attorney who initially received the evidence. The attorney may not be called to the stand and examined as to any of the circumstances which preceeded his possession and subsequent delivery to police of a piece of physical evidencehere the gun.[5] By thus allowing the prosecution to recover such evidence, the public interest is served, and by refusing the prosecution an opportunity to elicit the source of the evidence from the attorney, the client's privilege is preserved and a balance *1185 is reached between these conflicting interests. Cf. Olwell, supra.

REVERSIBLE ERROR
Finding the lower courts have erred in allowing Walsh to be called to the stand and examined relative to facts which preceeded the delivery of the gun to authorities, we now must determine whether the error constitutes a ground for reversal. La. C.Cr.P. art. 921 (1984). The state's position is it does not and in support argues:
(1) Any error in requiring Walsh to testify was harmless since Walsh's testimony was not used to prove an essential element of the crime.
(2) Even if this Court excludes Walsh's testimony relative to establishing the connexity between the defendant and the gun, the gun is still admissible since the state had proven by the use of other competent evidence the requisite connexity.
The state's arguments have merit. Before addressing the defendant's contention he was prejudiced, we point out it is clear any possible prejudice must come from the admission of the gun as opposed to Walsh's testimony since the latter was solely for the purpose of precipitating the former. Defendant concedes as much since he points to no prejudice resulting merely from allowing Walsh to testify. Instead defendant's sole argument is he was prejudiced by the admission of the gun which was not properly authenticated if one excludes Walsh's testimony.
Generally, physical evidence which has been held inadmissible has been found not to prejudice a defendant by its improper admission. State v. Proctor, 165 La. 584, 115 So. 759 (1928); State v. Helsley, 457 So.2d 707 (La.App. 2d Cir.1984).
In order to determine if improperly admitted evidence has prejudiced a defendant, this court has adopted the test for harmless error announced in Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). In State v. Gibson, 391 So.2d 421 (La.1980), this court determined the harmless error rule of Chapman used by the federal courts was "the standard most compatible with this Court's view of its own criminal appellate jurisdiction." Gibson, supra.
In Gibson the court was concerned with prejudice suffered by the defendant due to the introduction of evidence which had been obtained through an unreasonable search and seizure. The introduction of the evidence was found to be harmless by application of the Chapman test, i.e.,
".. whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction " and that "the court must be able to declare a belief that (the error) was harmless beyond a reasonable doubt," Gibson, supra. (Emphasis added.)
While the Chapman test was first used by this court in examination of constitutional errors, Justice Dennis, writing for a majority of the court in Gibson, stated "we think the Chapman rule provides a helpful... guide in cases involving errors of state procedure or state law." Gibson, supra.
Generally a reviewing court should only reverse a conviction when substantial rights of the accused have been violated by the introduction of inadmissible evidence. The purpose of the Chapman test is to allow the appellate courts to focus not only on the other evidence of guilt, but more importantly "on the incriminating quality of the tainted evidence" which was wrongfully admitted. Gibson, supra. Obviously, this is a more stringent test than the "substantial independent evidence" standard of review previously used by this Court. State v. Lane, 292 So.2d 711 (La. 1974).
Applying the Chapman standard to the present case, we conclude the error committed by the trial court in allowing Walsh to testify and thereby authenticate the gun was harmless error.[6] Green, by his own admission, shot Jones. The gun in no way was necessary to link Green to the *1186 shooting nor was it necessary for proof of any element of the crime of attempted manslaughter. La.R.S. 14:27, 31 (1986).[7] There is no reasonable possibility the introduction of the gun in any way contributed to the conviction. The other evidence introduced by the prosecution left no reasonable doubt that Green did in fact shoot Jones. Several eyewitnesses testified they saw Green shoot Jones. Furthermore, it is undisputed Jones did not die as a result of the shooting. Obviously, this is not a case of circumstantial evidence but instead a case involving direct testimony which established guilt beyond a reasonable doubt.
Given the weight of direct testimony in this case it is clear the error in allowing the gun to be admitted into evidence was harmless beyond a reasonable doubt. Gibson, supra. Defendant can point to no clear prejudice which resulted from the improper admission of the gun. Defendant's arguments are general and can be summarized by saying defendant feels his trial strategy may have been different had the gun been excluded at trial. We find defendant has not made a sufficient showing of injury (i.e., prejudice) resulting from the improper admission of the gun. See State v. Rideau, 278 So.2d 100 (La.1973); State v. Nahoum, 172 La. 83, 133 So. 370 (1931).

DECREE
For the reasons stated Green's conviction is affirmed.
The matter is remanded for further proceedings in accordance with law.
AFFIRMED.
DIXON, C.J., concurs.
NOTES
[1] La.R.S. 15:475 provides:

No legal adviser is permitted, whether during or after the termination of his employment as such, unless with his client's express consent, to disclose any communication made to him as such legal adviser by or on behalf of his client, or any advice given by him to his client, or any information that he may have gotten by reason of his being such legal adviser.
La.R.S. 15:475 (1981).
[2] In pertinent part the prosecutor's assurances were as follows:

(La.R.S.) 15:475 does not permit me to ask him about his communications with his client and I do not intend to do that. However, I do intend to ask him if he did represent Mr. Billie Green. Further, if he ever brought a gun to Baton Rouge Police Department. I do not even plan to ask him where he obtained the gun. And I intend to ask him no questions about his conversations with Mr. Billie Green.
[3] For other cases dealing with this exception to the general rule relative to the attorney-client privilege, see Clark v. U.S., 289 U.S. 1, 53 S.Ct. 465, 77 L.Ed. 993 (1933); In Re Sealed Case, 676 F.2d 793 (D.C.Cir.1982); In Re John Doe Corp., 675 F.2d 482 (2d Cir.1982); U.S. v. Bartlett, 449 F.2d 700 (8th Cir.1971), cert. denied 405 U.S. 932, 92 S.Ct. 990, 30 L.Ed.2d 805 (1972). For further citation and comment, see ABA/BNA Lawyer's Manual on Professional Conduct, § 55:902 (1984).
[4] Under our holding we give operative substance to La.R.S. 15:43. The state may subpoena the attorney to produce evidence of the commission of a crime by a client or third party which is in his possession without fearing the attorney may successfully invoke the attorneyclient privilege.
[5] Although as a general rule the identity of the client is a matter of public record and thus not covered by the attorney-client privilege, see Pike, supra; Hayes, supra, in cases such as this the attorney may not be called to the stand and asked to disclose the identity of his client. Anderson, supra, citing 16 A.L.R.3d 1047. The reason for the exception to the general rule is the disclosure of the client's identity alone would tend to incriminate the client. Therefore, the state must prove the existence of the relationship by other independent, admissible evidence.
[6] We pretermit a determination of whether the gun was admissible even excluding Walsh's testimony establishing its connection with Green. For purposes of this opinion we will assume the gun was not properly authenticated and therefore inadmissible. Our focus will be on whether the error in admitting the gun prejudiced defendant.
[7] La.R.S. 14:27 provides in part:

A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended....
C. An attempt is a separate but lesser grade of the intended crime....
La.R.S. 14:27 (1986).
La.R.S. 14:31 provides in part:
Manslaughter is:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection....
La.R.S. 14:31 (1986).