|, GASKINS, J.
Following a jury trial, the defendant, Terence Gilliam, was convicted of second degree murder in the shooting death of a three-year-old child. He was sentenced to the mandatory term of life imprisonment at hard labor without benefit of probation, parole or suspension of sentence. For the reasons set forth below, we affirm the defendant’s conviction and sentence.
FACTS
The facts of the offense are set forth in State v. Gilliam, 36,118 (La.App.2d Cir.8/30/02), 827 So.2d 608. In that case, the defendant’s brother, Demetric[1] Gilliam, was convicted of first degree murder and sentenced to life imprisonment at hard labor without benefit of probation, parole or suspension of sentence for his role in the murder; we affirmed.
On August 18, 1998, Tyrell Odell went to visit his three-year-old son, K.B.[2] He was accompanied by a friend, Eric Calhoun. Odell was driving a burgundy Mitsubishi Galant that belonged to his girl friend. Odell and Calhoun went to the home of K.B.’s mother, Teresa Bryant, to pick up K.B. to get a haircut and to buy clothes for the child. Ms. Bryant and her infant daughter, J.B., accompanied them on this excursion.
After running several errands, they stopped at the Hollywood Liquor Bank at Hollywood Avenue and Union Avenue at about 2 p.m. Odell got out of the car and went into the store; it is unclear as to whether Calhoun exited the vehicle. At any rate, after Odell left the store, all five of the occupants were again in the vehicle. Ms. Bryant was seated in the front | ^.passenger seat with her daughter on her lap. Calhoun was seated directly behind her while K.B. sat next to him, in the back seat behind the driver’s seat. Odell was in the driver’s seat.
As the Galant began to back up, it was struck by a teal green Pontiac. Inside this car were the defendant, his brother Deme-tric, and Larry White. Demetric had a .46 caliber handgun. White obtained a 12-gauge shotgun from the trunk of their car which was accessible through the back seat. The defendant likewise armed himself with a SKS or AK-47 assault rifle. The three men began firing into the Ga-lant.
*1200 Everyone in the Galant was hit by gunfire. J.B., the infant, was shot in the arm; the bullet fractured the bone. .Her mother received gunshot wounds to the chest and back; she was also hit in the mouth by a shotgun blast that fractured several teeth and lacerated her lip. Calhoun had several injuries, most notably to his left arm; the humerus and both bones of his forearm were fractured and there was an injury to the radial nerve. Calhoun also had a wound to the buttocks. Calhoun initially shielded K.B. from the gunfire; however, after he was shot, Calhoun was unable to maintain his hold on the child. The little boy jumped up and stood, holding onto the back of the driver’s seat. He was struck in the back of the head by a bullet from the assault rifle and died almost immediately.
Odell’s arm was grazed by a bullet. He was able to escape from the car. As he fled across Hollywood, Odell was shot in the legs and right buttock. He was able to reach the porch of a residence across the street where he collapsed. Finally, the shooters ceased firing, returned to the |sPontiac and fled the scene. Both Odell and Calhoun had recognized one of the shooters as Demetric Gilliam; they knew him by his nickname, “Red.”
Several witnesses observed the shooting. Ryan Perkins, age 11, was one of the passengers in a car driven by his brother Kevin. As they drove near the liquor store, Ryan witnessed the shooting. When Odell ran across Hollywood, Kevin had to stop their car to avoid hitting him. After the shooters fled, Kevin stopped in the store parking lot. The occupants of the Perkins car were the first persons to reach the Galant after the shooting and offer assistance to the victims.
Kevin Joseph, a security coordinator for the Caddo Parish School Board, was attending a course taught by the Caddo Parish Sheriffs office at the nearby Caddo Career Center. While running an errand, he saw the shooting. As a Desert Storm veteran, he was able to recognize the types of firearms involved; he also noticed that the person firing the assault rifle did not know how to properly handle the weapon. He returned to the career center and notified several of the police officers attending the same course. These officers immediately responded and went to the shooting scene.
Officer Allen Crump of the Shreveport Police Department was one of those officers. Upon arriving at the liquor store, he radioed for emergency assistance for the injured victims and began securing the crime scene. From the parking lot area, the police recovered four fired .12 gauge shot shells, five fired .45 caliber cartridge cases, and 20 fired 7.62 x 39 cartridge cases from a semiautomatic assault rifle.[3] They also found two projectiles: a 7.6214 x 39 bullet jacket and a .45 caliber bullet. Analysis of the damage to the Galant indicated that all shots were fired into the vehicle from the outside.
That evening the police received information that a suspect known as “Red” who was involved in the shooting was about to leave the jurisdiction. According to the police tip, he was at a house on Alma Street; the defendant’s girl friend, Shure-ka Harvey, lived at this residence. When Sgt. Michael Kellum drove up in an unmarked police car, he saw a black male exit the house with a very large garbage bag in his hand and walk toward the trunk of a vehicle. When the man saw Sgt. *1201 Kellum, he dropped the bag and walked briskly inside. The officer called for backup. Ms. Harvey came outside and spoke to Sgt. Kellum. She gave permission for the police to enter the house. Demetric Gilliam, the defendant’s brother, was found hiding in the attic. The teal green Pontiac involved in the shooting was discovered behind the house, covered by a tarp.
In addition to Demetric Gilliam, the police developed Larry White as a suspect in the shooting. White’s brother, Cornell Hall, who had the same nickname as Demetric Gilliam, “Red,” and who resembled the defendant, was also developed as a suspect; four witnesses identified Hall from a photo line-up. The three men were arrested and charged in the shooting death of K.B.[4]
According to the police, the defendant was considered as a suspect early in the investigation. However, his mother provided him with an alibi, Instating that he was at home babysitting at the time of the murder. When the police sought to talk to him, they were informed that he had gone to Texas.
Pam Smart of the Caddo Public Defender’s Office was appointed to represent Hall. At one point, Richard Ratcliff, a retired FBI agent and nationally recognized polygraph examiner, was hired by the Caddo Public Defender’s Office to do a polygraph on Hall; he passed two such tests. Ratcliff received a telephone call from the defendant who essentially confessed to his role in the shooting. After learning of this call, Ms. Smart telephoned the defendant in about mid-June 1999 and asked what his intentions were. He told her he wanted to do the right thing. When he asked if he might go to jail if he did the right thing, Ms. Smart told him he probably would go to jail. Despite that, he was still willing to give a statement.
The defendant also spoke to Cornell White, the father of Larry White and Cornell Hall. He told Mr. White that he was present at the shooting, not Hall. He said that he wanted to do the right thing and turn himself in to the police. After this conversation, Mr. White telephoned Clifford Devereaux, an investigator for the Caddo Public Defender’s Office.
On July 12, 1999, Devereaux and Mr. White picked up the defendant and brought him to the public defender’s office to give a statement. Also present was James McClure, the chief investigator for the Caddo Public Defender’s Office; Ms. Smart arrived after the interview began. The defendant gave them a tape recorded statement that he-not Cornell Hall-had been involved in the shooting.
| fiDevereaux and Ms. Smart took the recorded statement to the homicide screening section of the Caddo District Attorney’s Office. The investigators working on the case for the district attorney’s office decided to interview the defendant themselves. On July 13, 1999, the defendant voluntarily went to their office and gave a recorded statement to Johnny “Rusty” McKinley and Don Ashley. At the end of the statement, the investigators for the district attorney’s office requested that a deputy sheriff place the defendant under arrest for first degree murder.
Subsequently, the charges against Cornell Hall were dismissed, and he was released from jail.
In August 1999, the defendant was indicted for first degree murder; however, *1202 in September 2001, the charge was reduced to second degree murder.
In September 1999, the defendant filed a motion to suppress his statements to the employees of the Caddo Public Defender’s Office, as well as the statement to the investigators for the district attorney’s office. The trial court denied the motion.
In March 2002, a jury convicted the defendant as charged of second degree murder. The trial court imposed the mandatory sentence of life imprisonment at hard labor without benefit of probation, parole or suspension of sentence. The defendant’s motions for new trial and for post-verdict judgment of acquittal were denied.
The defendant appeals, asserting two assignments of error.
^SUFFICIENCY OF EVIDENCE
The defendant argues that the evidence, viewed in the light most favorable to the state, was not sufficient to convict him of second degree murder.

Law

When issues of both sufficiency of the evidence and trial errors are raised on appeal, the reviewing court should first address the sufficiency of the evidence claim. State v. Hearold, 603 So.2d 731 (La.1992); State v. Sharp, 35,714 (La.App.2d Cir.2/27/02), 810 So.2d 1179.
Under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the proper standard of appellate review for a sufficieney-of-evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Sharp, supra.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Sharp, supra; State v. Mackens, 35,350 (La.App.2d Cir.12/28/01), 803 So.2d 454, writ denied, 2002-0413 (La.1/24/03), 836 So.2d 37.
When circumstantial evidence forms the basis for conviction, such evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438. The court does not determine whether another possible hypothesis suggested by the defendant could afford an exculpatory explanation of the events; rather, when viewing the evidence in the light most favorable to the prosecution, the court determines whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt under Jackson v. Virginia. State v. Mackens, supra. This is not a separate test from Jackson v. Virginia. State v. Murray, 36,137 (La.App.2d Cir.8/29/02), 827 So.2d 488.
Second degree murder is the killing of a human being with the specific intent to kill or inflict great bodily harm. La. R.S. 14:30.1.

Discussion

The defendant contends that the entire case against him-except for his confessions which he claims were inadmissible-was circumstantial. Even though the defendant’s *1203 own brother placed him at the scene, the defendant argues that Demetric refused to admit that he saw the defendant fire any weapon.
We have determined that the defendant’s statements were admissible, as discussed infra. In these statements, he admitted that he was armed with an assault rifle which he fired multiple times at the Galant containing five |flpassengers. K.B. was struck and killed by a bullet from the weapon that the defendant admitted firing.
As to the testimony of the defendant’s brother that he did not see the defendant fire a weapon, we note that Demetric was impeached with his testimony from the penalty portion of his own first degree murder trial. On that occasion, he testified that the defendant had fired the assault rifle during the attack on the occupants of the Galant. At the defendant’s trial, Demetric asserted that he only “assumed” his brother fired it because the police reports said it had been fired.
Demetric’s credibility was further damaged when he was impeached with several other prior inconsistent statements; these included his admittedly false statements to the police that someone named “Fred” was present at the shooting instead of the defendant. Demetric conceded that the three weapons used in the attack were in his vehicle prior to the murder and that his passengers-the defendant and Larry White-exited the car. He claimed that he never saw them armed and did not know what happened “behind” him. He invoked his Fifth Amendment rights when asked whether he fired the handgun or the assault rifle. Demetric testified that he was keeping the shotgun and assault rifle for their real owner, a person named Jamar, and that Jamar retrieved those weapons from him after the shooting. While admitting ownership of the handgun, he stated that he and that gun had become “separated” after the shooting. The defendant admitted telling the police that he had thrown out the guns.
Even without the defendant’s multiple confessions, the circumstantial evidence — viewed in the light most favorable to the state-excludes every reasonable hypothesis of the defendant’s innocence. Several witnesses testified that there were three gunmen who arrived in the store parking lot in a Pontiac and ambushed the occupants of the Galant, indiscriminately firing into the vehicle at close range. Although these witnesses were unable to specifically identify the defendant, their testimony established that each shooter fired a different type of weapon — a handgun, a shotgun and an assault rifle. The use of these three types of firearms was verified by the forensic evidence gathered at the scene and by analysis of the damage to the Galant and the injuries to the victims. The two other shooters, Demetric Gilliam and Larry White, testified at the defendant’s trial that the defendant was the third person in the Pontiac. Even if the defendant was not the assailant who fired the shot that killed K.B., he was a principal in the indiscriminate shooting into a car with the specific intent to kill or cause great bodily harm to the occupants. State v. Gilliam, supra. A person may be convicted of an offense even if he has not personally fired the fatal shot. State v. Gilliam, supra; State v. Hampton, 1998-0331 (La.4/23/99), 750 So.2d 867, cert. denied, 528 U.S. 1007, 120 S.Ct. 504, 145 L.Ed.2d 390 (1999), rehearing denied, 528 U.S. 1108, 120 S.Ct. 855, 145 L.Ed.2d 721 (2000). We find here, as we did in his brother’s case, that it is of no consequence whether the defendant actually fired the bullet that struck and killed K.B.
This assignment of error is meritless.
*1204 J^MOTION TO SUPPRESS
The defendant contends that the trial court erred when it denied his motion to suppress the two inculpatory statements he gave prior to his arrest.

Contents of the statements

In his statement to the employees of the Caddo Public Defender’s Office on July 12, 1999, the defendant stated that on the day of the shooting, he was present at a friend’s house for a barbecue with Deme-tric, Larry White and Cornell Hall. Then Demetric, White and the defendant went to the liquor store while Hall remained at the house. Upon arriving in the parking lot, they saw Tyrell Odell run from the store, jump in his car, put the vehicle in reverse and back into Demetric’s car. He stated that Odell shot at them, so they fired back. According to the defendant, Demetric always kept his handgun next to his arm rest. The defendant got a SKS assault rifle and White obtained a shotgun from the trunk of their car; the trunk was accessible through an opening in the back seat. The defendant admitted shooting “the girl in the passenger seat” and firing his weapon until it was empty. He stated that he did not know what his brother did with the guns.
The defendant said that at a point prior to the shooting, some of Odell’s friends had pulled a gun on him at a service station and “jumped” him. He stated that they had also broken into his mother’s house and pulled a gun on his niece. He also said that Odell had threatened to kill him and his mother. When asked why he was coming forward, the defendant said that it bothered him that Hall was in jail for something he didn’t do.
|1«>At the beginning of the defendant’s statement to the district attorney’s investigators on July 13, 1999, the investigators read him his rights, including his right to remain silent and to have an attorney; he waived these rights and signed a waiver form. The defendant told essentially the same story with some modifications. The defendant claimed that he only shot out the tires of the Galant and fired at Odell as he ran across the street.[5] He did not mention shooting Ms. Bryant. In this version, he said that Demetric also fired the assault rifle.
When asked about why he came forward, he said he wanted “everybody to get out of jail and let it be self defense ...”[6] He admitted that he was warned by the investigators before the statement began that there was a “true possibility” that he would be arrested. He further conceded that no promises or threats had been made to him to obtain his statement.

Law

Before a confession can be introduced into evidence, it must be affirmatively shown that it was free and voluntary, and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. La. R.S. 15:451. The state must also establish that an accused who makes a statement during custodial interrogation was first advised of his Miranda rights. State v. Sharp, supra. A trial court’s findings regarding the admissibility of a confession are entitled to great weight and will not be disturbed unless unsupported by the evidence. State v. Sharp, supra. |13 Testimo *1205 ny of the interviewing police officer alone may be sufficient to prove that the statement was freely and voluntarily given. State v. Mackens, supra.

Discussion

The defendant argues that his two incul-patory statements should have been suppressed. He asserts that he had a reasonable expectation of confidentiality when he gave his statement to the Caddo Public Defender’s Office because he was told that the office represented poor people charged with crimes. In support of this argument, he cited State v. Green, 493 So.2d 1178 (La.1986). He also contends he should have been afforded counsel by the public defender’s office prior to giving his statement. Asserting the inadmissibility of the first statement, he argues that the second statement to the district attorney’s investigators should be inadmissible as “fruit of the poison vine.”
We note at the outset that the Green case is distinguishable from the present one. In Green, supra, there was no question that the attorney involved represented that defendant; thus, an attorney-client privilege existed which prevented the attorney from disclosing the client’s confidences.
In the instant case, the testimony of the employees of the Caddo Public Defender’s Office who were involved in the defendant’s initial statement established that Ms. Smart was representing Cornell Hall, not the defendant, and that the defendant was made aware of this fact. He was neither offered an attorney nor did he request one. Not only did he know | uthat the information he gave them about his involvement in the shooting would be used to clear Hall of the murder charges, the defendant’s express purpose in coming forward was to secure the release of the wrongly incarcerated Hall. McClure and Devereaux, the investigators for the Caddo Public Defender’s Office, testified that they told the defendant that they were not police officers. The interview at the public defender’s office was not a custodial interrogation and the defendant was free to leave at any time. When the defendant voluntarily met with the district attorney’s investigators the following day, he was informed of his rights; he signed a written waiver of those rights. The district attorney’s investigators testified that they made no promises or threats to induce the defendant to speak to them.
We also note that even before the defendant gave his formal statements to personnel from the public defender’s office and the district attorney’s office, he admitted his participation in the shooting to Ratcliff, the former FBI agent who administered the polygraph to Hall, and to Hall’s father.
Based on the above, it cannot be said that the defendant had any expectation of confidentiality in his statement at the Cad-do Public Defender’s Office. To the contrary, it is abundantly clear from this record that the defendant wanted to tell the truth about his participation in the murder of K.B. in order to free Hall from being imprisoned for a crime that the defendant had committed.
hsThis assignment of error is meritless.
CONCLUSION
The conviction and sentence of the defendant are affirmed.
AFFIRMED.

. His name is sometimes spelled "Demetrius” in the record.

. Pursuant to La. R.S. 46:1844(W), we will use initials to designate the minor victims— K.B. for the murder victim and J.B. for his eight-month-old sister who was also injured.

. As previously noted, subsequent examination revealed that the bullet fragments recovered during K.B.'s autopsy were consistent with the bullet jacket of 7.62 x 39 caliber bullet.

. As already noted, Demetric Gilliam was convicted of first degree murder. White pled guilty to manslaughter.

. However, several trial witnesses testified that the tires on the Galant were not damaged.

. This is in keeping with the testimony of Demetric Gilliam who stated that he and Cornell Hall both told the defendant it was in their best interest for him to come forward and admit his role in the shooting.