STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

2019 KA 0777

STATE OF LOUISIANA

VERSUS

OLLIE MONTRELL SELDERS, JR.

Judgment Rendered:   **DEC 2 7 2019**

* * * * * * *

On Appeal from the 21st Judicial District Court
In and for the Parish of Livingston
State of Louisiana
Trial Court No. 36170

Honorable Robert H. Morrison, III, Judge Presiding

* * * * * * *

Scott M. Perrilloux
District Attorney
Patricia Amos
Assistant District Attorney
Amite, Louisiana

Attorneys for Appellee,
State of Louisiana

Gwendolyn K. Brown
Baton Rouge, Louisiana

Attorney for Defendant/Appellant,
Ollie Montrell Selders, Jr.

* * * * * * *

**BEFORE:  HIGGINBOTHAM, PENZATO, AND LANIER, JJ.**

**PENZATO, J.**

The defendant, Ollie Montrell Selders, Jr., was charged by grand jury indictment with second degree murder, a violation of La. R.S. 14:30.1 (count I); and obstruction of justice, a violation of La. R.S. 14:130.1 (count II). He pled not guilty on both counts. He filed a pre-trial motion in limine, which was denied. Following a jury trial, he was found guilty as charged on both counts. He moved for a post-verdict judgment of acquittal, but the motion was denied. On count I, he was sentenced to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. On count II, he was sentenced to two years imprisonment at hard labor to run concurrently with the sentence imposed on count I. He now appeals, challenging the denial of his motion to present impeachment evidence at trial and the rulings on the motion in limine and for a post-verdict judgment of acquittal. For the following reasons, we affirm the convictions and sentences.

## FACTS

On June 27, 2017, the defendant called 911 and asked for an ambulance because the victim, Letisha Rheams, his "old lady," had a hole in her back. Livingston Parish Sheriff's Office deputies arrived at the defendant's trailer in Livingston Parish. There was a pool of blood by the stove in the kitchen, which was smeared out to the front porch in a dragging pattern.[1] There was blood splatter on the wall by the stove. There was a suitcase in the kitchen by the washing machine. A 20-gauge shotgun shell casing was on top of a pile of clothes next to the washing machine. Three additional 20-gauge shotgun shell casings were in the area of the master bedroom. A fifth 20-gauge shotgun shell casing was on the ground by the steps to the rear door. There were three holes in the wall of the master bedroom

---

[1] No testimony was presented concerning the condition of the victim when the police arrived.

2

caused by shotgun blasts that exited the exterior of the trailer, and two cell phones on the ground outside the master bedroom window. There was no rust or weather damage around the holes in the bedroom wall. The defendant told the police at the scene that he had put the shotgun in the woods. The shotgun was recovered from an area of tall grass approximately forty-five feet from the rear of the trailer. The defendant speculated that the victim may have accidentally shot herself after "grabbing" the shotgun while dragging a clothes basket.

In a July 6, 2017 videotaped interview concerning the incident, the defendant claimed the victim was alive and uninjured when he left to meet his mother and run some errands for about forty-five minutes on the day of the incident. A friend, Jerry Addison, picked up the defendant and drove him back to the defendant's trailer after completing the errands. The defendant stated he opened the door of his trailer and immediately saw smoke from the toaster. He indicated he found the victim on the floor, thought she may have had a seizure, and was unable to revive her. He claimed he only discovered the victim had been shot when the 911 operator asked him to look at the victim's body to see if he could tell what was wrong with her. According to the defendant, his shotgun was on the floor pointing straight at the victim. The defendant claimed he took the weapon outside to keep it away from his children or anyone else that came into the trailer. The defendant speculated the victim had been accidentally shot after propping the shotgun on a wire used to secure the back door and turning her back on the weapon. He stated there was no trigger guard on the shotgun and "it is easy, too, too easy for an accident to happen." The defendant also indicated he was aware the victim had been "messing with" Eric Charles for about four months. He claimed, however, he was not bothered by the affair.

Addison testified at trial that he had known the defendant since they were "kids in school." Addison denied shooting the victim. According to Addison, on June 27, 2017, the defendant called and asked him for a ride to pick up a pack of

3

cigarettes. Addison had taken Percocet and Xanax that morning before going to a doctor's appointment, and picked up the defendant between 10:00 a.m. and 10:30 a.m. from the defendant's parents' house. The defendant's parents' house was located at the front of Selders Lane while the defendant's home was located at the back of Selders Lane.

Addison drove the defendant to meet his mother, to Dollar General, to a double-wide trailer, and then back to the defendant's trailer. The defendant got out of Addison's vehicle and started walking toward his trailer while Addison stayed in the vehicle listening to loud music. After the defendant had walked approximately twenty to twenty-five feet to his front door, Addison exited his vehicle to urinate by the right side of the trailer. According to Addison, as he was walking back to his vehicle, he heard the defendant shouting, "Tish, what did you do," "what have you done," and "Jerry, help me." Addison turned to look at the trailer and saw smoke coming from it. He walked into the trailer and saw the victim laying on the floor and the defendant trying to pick her up. He helped the defendant move the victim out to the front porch. Addison indicated the defendant was on the phone "with 911" and gave his shirt to Addison to put pressure on the victim's wound.

Dr. Jimmie Smith, forensic pathologist at the East Baton Rouge Coroner's Office, conducted an autopsy of the victim. Dr. Smith concluded the victim died as a result of a shotgun wound to her back, which perforated her spleen, left lung, and heart. She died less than ten minutes after being shot. Based upon the autopsy, Dr. Smith estimated that the victim was two to three feet from the muzzle of the shotgun when she was struck in the left lower back.

Cheryl Swearinger of the Louisiana State Police Crime Laboratory was accepted as an expert in the field of firearms and ballistics analysis. She examined the shotgun recovered from the scene of the incident. The weapon was a "break action," "hinge action," or "crack barrel" shotgun, meaning one shotgun shell could

4

be placed in the barrel at a time. The weapon could then be closed, the hammer cocked back, and the trigger pulled to fire the shotgun. The weapon could not be fired unless the hammer was pulled back. Swearinger intentionally attempted to cause an accidental firing of the weapon, but was unsuccessful. The weapon did not have a "trigger guard," but Swearinger testified the hammer served as a "safety" and functioned properly.

## RIGHT TO CONFRONTATION

In assignment of error number 1, the defendant contends the trial court erred in impermissibly restricting his opportunity to impeach trial witness Kodi Goings, and the error was not harmless[2] because it deprived him of the opportunity to show that Goings was biased.

Any party may attack the credibility of a witness by questioning him about any matter having a reasonable tendency to disprove the truthfulness or accuracy of his testimony or through extrinsic evidence showing the witness' bias, interest, corruption, or defect of capacity, unless otherwise provided by legislation. La. C.E. art. 607. Louisiana's Code of Evidence specifically provides that every witness in a criminal case subjects himself to examination relative to his criminal convictions, and that evidence of an arrest, arrest warrant, indictment, prosecution, or acquittal may not be used to impeach the witness' *general credibility*. See La. C.E. art. 609.1; *State v. Brady*, 381 So.2d 819, 821-22 (La. 1980). However, this does not mean a witness may never be questioned about arrests or pending charges. *State v. Mills*, 2018-0047 (La. App. 1st Cir. 9/24/18), 259 So.3d 1045, 1046, writ denied, 2018-1686 (La. 4/15/19), 267 So.3d 1128.

---

[2] Confrontation errors are subject to harmless error analysis. *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986); see also La. C.Cr.P. art. 921.

The Sixth Amendment of the United States Constitution and article I, § 16 of the Louisiana Constitution guarantee an accused in a criminal prosecution the right to confront the witnesses against him, which includes the right to cross-examine the state's witnesses. *Davis v. Alaska*, 415 U.S. 308, 315-16, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974); *State v. Robinson*, 2001-0273 (La. 5/17/02), 817 So.2d 1131, 1135. Cross-examination is the primary means of testing the truthfulness of a witness' testimony and an essential safeguard of a fair trial. See *Davis*, 415 U.S. at 316, 94 S.Ct. at 1110; *Pointer v. Texas*, 380 U.S. 400, 404, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965); *Robinson*, 817 So.2d at 1135. To cross-examine a witness effectively, a defendant must be afforded the opportunity to demonstrate any bias or self-interest attached to the witness' testimony. See La. C.E. art. 607(D)(1); *State v. Rankin*, 465 So.2d 679, 681 (La. 1985). A witness' hope or knowledge he will receive leniency from the state is highly relevant to establish bias or interest, as is the possibility the prosecution may have some leverage over a witness due to pending criminal charges or a plea agreement. See *Rankin*, 465 So.2d at 681; *Brady*, 381 So.2d at 822; *State v. Franks*, 363 So.2d 518, 520 (La. 1978); *State v. Mills*, 2013-0573 (La. App. 1st Cir. 8/27/14), 153 So.3d 481, 489, writs denied, 2014-2027 (La. 5/22/15), 170 So.3d 982, and 2014-2269 (La. 9/18/15), 178 So.3d 139. Thus, cross-examination regarding arrests or pending charges may be appropriate to expose a witness' motivation in testifying. See *Brady*, 381 So.2d at 822; *Mills*, 259 So.3d at 1047.

Goings appeared at trial dressed in prison attire. She testified she was struggling with drug addiction in June of 2017. Between June and August of 2017, she was living at the home of Theresa Bennett, her friend. After the victim's death, Goings' relationship with the defendant became intimate. Goings was at Bennett's trailer on the day the defendant was arrested. She testified she was on Xanax that day. The defendant arrived at the trailer sometime in the afternoon, said the police

6

were coming, removed the SIM card from his phone, and left "out the window." The defendant returned later that day.

On cross-examination, the defense asked Goings whether she had two sets of pending charges in the district. The State objected and a bench conference was held. The defense argued the fact that charges were pending against Goings was "indicative of bias and the reason to testify in favor of the State; and, therefore, it is admissible." The court stated the defense would be permitted to ask Goings if she had been promised any leniency or anything in connection with her testimony, but would not be permitted to ask about pending charges. The court noted Goings was "obviously in custody." The State indicated it understood its duty to disclose any deal, and no deal had been disclosed, "because, in our mind, there is no deal." The defense proffered Livingston Parish bills of information filed September 20, 2018 and December 11, 2018, charging Goings with three counts of simple burglary and one count of simple burglary, respectively.

In the presence of the jury, the defense asked Goings if she had been promised anything in exchange for her testimony, and she answered, "No, sir." The defense also asked Goings if she would get some leniency for her testimony, and she answered, "No, sir." In response to further questioning by the State, Goings indicated: she and her lawyer had met with the State the previous week; the State had not promised her anything; and the State had not told her "[the State] would help [Goings] out," but had told her to "[j]ust tell the truth."

We find there was no error in the trial court's ruling. There is no basis beyond speculation for arguing Goings' testimony was biased because she hoped to garner favor from the State relative to her pending charges. The jury was aware Goings was incarcerated, and the only evidence concerning her bias, if any, was her repeated testimony that she had been promised nothing and offered no leniency for her testimony. See *Mills*, 259 So.3d at 1047; *State v. Grace*, 94-295 (La. App. 5th Cir.

7

9/27/94), 643 So.2d 1306, 1307-09 (the trial court properly refused to allow cross-examination of the State's witness regarding charges against him where there was no evidence of a deal or other indicia of bias or prejudice); cf. *State v. Davis*, 2000-2685 (La. App. 1st Cir. 11/9/01), 818 So.2d 76, 81-83 (questioning of a key State witness concerning whether he had made a deal with Mississippi authorities to avoid prosecution should have been allowed where the witness testified he had previously made a deal with those authorities to be released on a "murder and burglary charge" and where the defendant was attempting to show that by collaboration between jurisdictions, the State had some leverage over the witness); *State v. Harrison*, 484 So.2d 882, 883-84 (La. App. 1st Cir.), writ denied, 488 So.2d 688 (La. 1986) (questioning about dismissed charges should have been allowed where the time limitation on prosecuting the witness had not lapsed).

This assignment of error is without merit.

## EVIDENCE OF OTHER WRONGS OR ACTS

In assignment of error number 2, the defendant contends the trial court erred in denying the defense motion in limine to exclude evidence that the defendant and the victim argued the night before the incident. In assignment of error number 3, the defendant contends the trial court erred in denying the motion for post-verdict judgment of acquittal based on the admission of the same evidence. The defendant argues the challenged evidence was irrelevant to any issue before the court because there was no indication of any physical conflict between the defendant and the victim, and thus, there was no basis to conclude that the argument provided any motivation for murder. Additionally, the defendant argues the trial court erred "in finding that the argument that occurred on the night prior to [the victim's] death constituted an integral part of the crimes charged," citing, *State v. Scott*, 2015-1762 (La. 11/30/15), 184 So.3d 2 (per curiam).

8

Generally, evidence of other wrongs or acts is inadmissible as substantive evidence because of the substantial risk of grave prejudice to the defendant. *State v. Day*, 2012-1749 (La. App. 1st Cir. 6/7/13), 119 So.3d 810, 813. Under La. C.E. art. 404(B)(1), other crimes, wrongs, or acts evidence "is not admissible to prove the character of a person in order to show that he acted in conformity therewith." The evidence may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident. La. C.E. art. 404(B)(1). At least one of the enumerated purposes in Article 404(B) must be at issue, have some independent relevance, or be an element of the crime charged in order for the evidence to be admissible under Article 404. Thus, to be admissible under Article 404(B), evidence of the defendant's prior bad acts must meet two criteria: (1) it must be relevant to some issue other than the defendant's character, and (2) its probative value must be greater than its potential to unfairly prejudice the jury. See La. C.E. arts. 403 & 404(B). A trial court's ruling on the admissibility of evidence of other crimes, wrongs, or acts will not be overturned absent an abuse of discretion. *Day*, 119 So.3d at 813.

Any inculpatory evidence is "prejudicial" to a defendant, especially when it is "probative" to a high degree. *State v. Taylor*, 2016-1124 (La. 12/1/16), 217 So.3d 283, 295. As used in the balancing test, "prejudicial" limits the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial. *Id*; see also *Old Chief v. United States*, 519 U.S. 172, 180, 117 S.Ct. 644, 650, 136 L.Ed.2d 574 (1997) ("The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged."); *State v. Rose*, 2006-0402 (La. 2/22/07), 949 So.2d 1236, 1244.

Prior to trial, the defendant moved to exclude any testimony at trial from Gladys Rheams and Kendrick Cryer[3] on the grounds that it was hearsay, lacked foundation, was irrelevant, immaterial, and was not part of the res gestae of the alleged offense.

Gladys[4] testified at the hearing on the motion that on the day before the victim's death, she went to the home the defendant and the victim shared after the victim called her. Gladys stated the victim and the defendant "had got into it." The victim asked Gladys if the victim and her children could come and stay with Gladys, and Gladys agreed. Thereafter, the defendant arrived. He complained that "every time [the victim and the defendant] get into it [the victim] calls [Gladys and Cryer] to come pick her up." The victim did not leave with Gladys because "she was tired of leaving her house" and was "tired of arguing and fighting." Gladys planned to return for the victim the next day. While Gladys was at the trailer the victim and the defendant shared, she saw someone hand the defendant a 12-gauge shotgun shell.[5] Gladys did not see any bruising or marks on the victim.

Cryer, Gladys' husband, also testified at the hearing. He indicated that on the day the victim called Gladys, Gladys and he "went out there to go get her." Cryer described the victim's demeanor as "frightened, fear, scared." Cryer also saw a person whom he called "Red Eye" approach the defendant and ask him, "you didn't kill that coon last night?" The defendant replied, "no . . . I didn't get him last night." Red Eye then gave the defendant a red and silver 12-gauge shotgun shell.[6] The defendant said, "I'm going to get that coon tonight." Cryer stated the victim did not leave with Gladys and him because she was tired of leaving her

---

[3] In the motion in limine, the defendant referred to "Kendrick Rheams," but at trial, Kendrick testified his last name was "Cryer."

[4] We reference Gladys Rheams, the victim's aunt, by her first name to avoid confusing her with the victim.

[5] The shotgun shells recovered from the crime scene were 20-gauge shotgun shells.

[6] The shotgun shells recovered from the crime scene were yellow and silver shotgun shells.

home, but rather asked the defendant to leave. The defendant had not left at the time Gladys and Cryer left. According to Cryer, the victim made plans with Gladys to have Gladys pick up her and her children the next morning.

The trial court ruled as follows:

I have heard only the testimony of these two witnesses and the questioning of counsel during voir dire and their opening statements. As far as connexity, it is difficult for me, at this point, since I have not heard any evidence as far as anything further, to determine whether this actually falls into res gestae or not, because I don't know if there's any other statement in connection with that.

However, as far as any type of possible motive on the thing, without – and let me make it clear. I don't want any statement as far as quoting anyone. I will allow these witnesses to testify as to their general understanding that [the victim] intended to move – [the victim] intended to move out but did not that evening, and that [the defendant] was handed a shell, and I will limit that testimony to that without direct statements as to any quotation of specific words that they heard, just as to their general intent based on their understanding that they were there to or were there to move or assist [the victim] in moving out of the residence. Note defense objection to that.

Although the State claims the defendant did not object to the court's ruling and therefore did not preserve this issue for appellate review, the trial court expressly noted the "defense objection" in its ruling. Further, the trial court was ruling on a written motion. The requirement of a contemporaneous objection to preserve review after verdict does not apply to the court's ruling on any written motion. La. C.Cr.P. art. 841(B). Accordingly, this assignment of error is properly before this court.

Addressing the defendant's claims on the merits, we find the trial court did not abuse its discretion in refusing to exclude evidence that the defendant and the victim argued the night before the incident. The court correctly found the evidence was highly probative of the issue of the defendant's motive in killing the victim, i.e., to prevent her from leaving him. The probative value of this evidence is further established by the defense's claim of an accidental shooting, which directly placed "intent" and "absence of mistake or accident" at issue. See La. C.E. art. 404(B)(1).

11

Further, the prejudicial effect to the defendant from the challenged evidence did not rise to the level of undue or unfair prejudice when balanced against the probative value of the evidence.

*Scott*, the case relied upon by the defendant, involved a prosecution for second degree murder and obstruction of justice, allegedly committed on August 28, 2012. The defendant admitted he stabbed the victim, but claimed self-defense. The defendant filed a motion in limine to exclude any evidence he attacked or threatened his former girlfriend or her friend. *Scott*, 184 So.3d at 3.

The trial court found evidence the defendant threatened his former girlfriend with a knife on August 6, 2012, and attacked her and stole her phone on September 2, 2012, was admissible as res gestae. A divided appellate court denied writs on the showing made. *Scott*, 184 So.3d at 4. The Louisiana Supreme Court reversed the lower courts and remanded, noting "res gestae" was more correctly described as the integral act doctrine under present law,[7] and the test was whether the other crimes were "intertwined with the charged offense to such an extent that the [S]tate could not have accurately presented its case without reference to it." *Scott*, 184 So.3d at 5 (citing *State v. Brewington*, 601 So.2d 656, 657 (La. 1992) (per curiam)). The Louisiana Supreme Court found the State made no effort to explain how either of the challenged incidents were closely connected or intertwined with the charged offenses. *Scott*, 184 So.3d at 6. *Scott* is factually and procedurally distinguishable from the instant case.

---

[7] See La. C.E. art. 404(B)(1) ("or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.").

In this case, the State offered the testimony of Gladys and Cryer in response to the motion in limine. The theory of the State's case was that the relationship between the defendant and the victim was "toxic," such that the defendant desired to control the victim. The State argued that the defendant shot and killed the victim because letting the victim leave meant he risked losing the control he exerted over the victim. Hence, Gladys' and Cryer's testimony that the victim and the defendant argued on the night before the incident and that the victim planned to leave the defendant on the day of the incident was admissible: (1) as proof of motive, intent, and absence of mistake or accident; (2) because it related to conduct that constituted an integral part of the act that was the subject of the present proceeding; and (3) because it was intertwined with the charged offense to such an extent that the State could not have accurately presented its case without reference to it. See La. C.E. art. 404(B)(1); *Scott*, 184 So.3d at 5; *Brewington*, 601 So.2d at 657. We therefore find the trial court did not err in denying defendant's motions to exclude this evidence of other acts by the defendant.

These assignments of error are without merit.

**CONVICTIONS AND SENTENCES AFFIRMED.**